JAMES BLACK GROOME, GOVERNOR of MARYLAND *vs.* CHARLES J. M. GWINN.

*Construction of the Constitution in respect of a Contested election for the office of Attorney General—Duty of the Governor to issue the Commission and administer the oath of office to the person shown by the Returns to have been elected as Attorney General—Person so returned as Elected, entitled to hold the office pending a Contest for the same—Ministerial duties imposed upon the Governor—When mandamus will lie—Legislative provision required to enable the Governor to exercise the Jurisdiction conferred upon him by the Constitution, to hear and decide the case of a Contested election for the office of Attorney General.*

At an election held on the 2nd of November, 1875, W. and G. were candidates for the office of Attorney General of the State. The returns of the election as officially certified to the Governor, showed that G. had received a ma-

jority of all the votes cast for Attorney General. W. gave notice to the Governor of his intention to contest the election of G. The Governor, after hearing arguments in behalf of the respective parties, decided that according to the returns of the election duly made and certified to him, G. had received a majority of all the votes of the qualified voters of the State cast at the election for Attorney General, and according to said returns, he was elected Attorney General, and was entitled to be commissioned and sworn in, if the Governor had no constitutional power to go behind the returns. The Governor was of opinion, however, that there was sufficient reason to induce an examination of the questions involved in the contest, by evidence outside of the returns, if he, as Governor, possessed such power under the Constitution, and he declined to issue a commission to G. as Attorney General. G. thereupon applied to the Circuit Court for Anne Arundel County for the writ of *mandamus* to compel the Governor to issue the commission and administer to him the oath. Section 2 of Article V. of the Constitution provides that, "All elections for Attorney General shall be certified to, and returns made thereof, by the clerks of the Circuit Courts of the several counties, and the clerk of the Superior Court of Baltimore City, to the Governor of the State, whose duty it shall be to decide on the election and qualification of the person returned; and in case of a tie between two or more persons, to designate which of said persons shall qualify as Attorney General, and to administer the oath of office to the person elected." Section 11 of Article IV. provides that, "The election for Judges, hereinbefore provided for, and all elections for Clerks, Registers of Wills, and other officers, provided in this Constitution, except State's Attorneys, shall be certified, and the returns made, by the clerks of the Circuit Courts of the counties, and the clerk of the Superior Court of Baltimore City, respectively, to the Governor, who shall issue commissions to the different persons for the offices to which they shall have been respectively elected; and in all such elections, the person having the greatest number of votes shall be declared to be elected." Section 47 of Article III. provides that, "The General Assembly shall make provision for all cases of contested elections of any of the officers, not herein provided for," and the 56th section of the same Article provides that, "The General Assembly shall have power to pass all such laws as may be necessary and proper for carrying into execution the powers vested by this Constitution in any Department or office of the Government, and the duties imposed upon them thereby." The Act of 1865 ch, 143, after prescribing the manner in which the returns of the election shall be made, directs that "from the returns so made, the Governor shall issue commissions to the different persons elected." Held:

1st. That under the Constitution and the Act of 1865, it became the duty of the Governor, as soon as he decided that according to the returns G. was

elected, and that he had the constitutional qualifications for the office, to issue the commission and administer to him the official oath.

2nd. That the *prima facie* title of G. to the office was established, and his right to be installed; and this right was not defeated by a mere allegation that he had not been legally elected, or by a notice of a contest. He was entitled to hold the office pending the contest, and until his title as shown by the returns should be defeated by legal proof.

3rd. That issuing the commission and administering the oath of office, were merely ministerial duties imposed upon the Governor, and a *mandamus* would lie to direct their performance.

4th. That under the Constitution and existing laws, the Governor has *jurisdiction* to hear and decide the case of a contested election for the office of Attorney General; but until the Legislature clothes him with the authority, and gives him the means and instrumentalities of exercising it, as empowered to do under section 56 of Article III. of the Constitution, he has no power to examine and decide the questions raised by such contest.

APPEAL from the Circuit Court for Anne Arundel County.

At a general election held on the 2nd of November, 1875, Messrs. S. Teackle Wallis and Charles J. M. Gwinn, were candidates for the office of Attorney General of the State. The returns of the election, as certified to the Governor by the proper officers, showed that Mr. Gwinn had received a majority of all the votes cast for Attorney General. On the 16th of November, Mr. Wallis addressed a communication to the Governor, notifying him of his intention to contest the election of Mr. Gwinn as Attorney General of the State at the election held on the 2nd instant, on the ground that the election in the city of Baltimore, was rendered wholly void by fraud, intimidation and violence, and that the returns of the city could not lawfully be counted. To this communication, the Governor replied, signifying that he would be pleased to receive from Messrs. Wallis and Gwinn, or their respective attorneys, written arguments as to his authority to entertain the contest proposed, and as to the extent of

his powers in regard thereto.   In response to this request, written arguments were furnished by Messrs. Wallis and Gwinn to the Governor ; and further oral arguments were heard by him in their behalf.   On the 6th of December, 1875, the Governor announced his decision as follows, upon the the questions argued before him :

"The election for Attorney General of this State being certified, and returns thereof made to me as Governor by the Clerks of the Circuit Courts of the several counties, and the Clerk of the Superior Court of Baltimore city, as provided by the Constitution and laws of this State ; and said returns, as certified, having been canvassed by me, I do hereby, in pursuance of the Constitution and upon the basis of said returns, decide, that according thereto, the Hon. Charles J. M. Gwinn received a majority of all the votes of the qualified voters of this State cast at said election, and that he was therefore—that is, according to said returns—elected Attorney General of this State at said election.   I also further decide, that the Hon. Chas. J. M. Gwinn is duly qualified for and eligible to said office, under the Constitution of this State, and was so on the day of said election.   I also further state, as a part of this decision, and to be taken in connection therewith, that the same as to the fact of election is made exclusively upon the basis of said returns certified, and without any inquiry upon any alleged facts outside of the same.

"I also state, that whether or not the Governor has power to take evidence *dehors* the returns, and decide the election of the Attorney General thereon, or upon anything except the returns, is a question of construction of section 2 of Article 5 of the Constitution, which is so close and serious, that, in my opinion, it should be settled by the Courts ; and, therefore, and inasmuch as there appears sufficient reason to induce a hearing outside of the returns, if the Governor have power under the Constitution, I shall, for the present, withhold any commission to

Mr. Gwinn, and do hereby declare my intention to proceed with the hearing and examination of the question involved in the contest by evidence extraneous to the returns, unless restrained by the Courts, or unless ordered by a *mandamus* to issue a commission to Mr. Gwinn—the object of this action being to enable Mr. Gwinn to apply to the Courts for a *mandamus* for a commission, or for such relief as he is entitled to.

"If the Courts should decide that the Governor is bound to issue the commission in favor of the person whom the returns alone show to be elected, and whom the Governor decides possesses, and did possess on the day of said election, all the constitutional qualifications, that will end the matter, and make the issuing of the commission a mere ministerial duty or form. If the Courts conclude otherwise, or Mr. Gwinn fails to act as soon as possible, the investigation will be further proceeded with. This course protects Mr. Wallis in any rights he may have, and enables Mr. Gwinn speedily to bring the question before the Courts, and obtain his commission, if entitled to it in the opinion of the Courts, on the basis of the returns alone.

"After a careful review of the question of construction involved, I am deeply impressed with its difficulty and importance, and it is my clear duty to put the controversy in such shape, that the rights of each will be protected, and the Courts be entitled to decide it authoritatively. An important constitutional question like this, involving the power of the Executive, should be determined by the Judicial branch of the government."

Mr. Gwinn, thereupon, on the 9th of December, filed his petition to the Judges of the Circuit Court for Anne Arundel County, for a *mandamus*.

The petition averred that the Governor, having canvassed the returns officially made to him, had decided that the petitioner received a majority of the votes of the qualified voters of the State, and, according to said re-

turns, was elected Attorney General. It averred that the Governor had further decided, that the petitioner was eligible to said office, and qualified for the same under the Constitution. By virtue of these two decisions, the petition charged that the petitioner became *ipso facto*, entitled to receive his commission, and have the official oath administered to him, and that it became the duty of the Governor, forthwith, to issue the one and administer the other. The petition then averred the refusal of the Governor to discharge his alleged duty, and prayed that the writ of *mandamus* might be granted, compelling him to issue the commission and administer the oath accordingly.

The answer of the Governor admitted that he had decided the petitioner to be eligible, and duly qualified under the Constitution. It further admitted that, upon the face of the returns, the petitioner appeared to have received a majority of the qualified votes of the State, and that the Governor had decided, that according to the returns, he was elected Attorney General, and was entitled to be commissioned and sworn in, if the Governor had no constitutional power to go behind the returns, upon which, only and exclusively, his decision, thus far, had been based. But the answer went on to aver the contest on the part of Mr. Wallis, before the making of the decisions aforesaid; his denial of Mr. Gwinn's election; his impeachment of the truth of the returns, and his claim that he himself was duly elected. The answer set forth the grounds on which Mr. Wallis relied, and then averred the Governor's belief that in his judgment, as Governor, there was sufficient reason for going behind the returns, and examining into the charges and claims of Mr. Wallis, if the Governor had the constitutional right so to do, which he accordingly claimed, subject to the Court's opinion. Should the Court hold that he had a right to go behind and outside of the returns, and examine into the questions presented to him by

37                    v. 43.

the contest of Mr. Wallis, the Governor respectfully asked that the Court would advise him as to the means and mode of doing so.

By agreement of counsel, all informalities in the pleadings were waived. Upon the assent and agreement of parties, a *pro forma* order was passed by the Court, directing the writ of *mandamus* to issue as prayed. From this order, the Governor appealed.

The cause was argued before Bartol, C. J., Stewart, Grason, Miller and Robinson, J.

*A. B. Hagner*, for the appellant, and *Robert D. Morrison*, intervening for Mr. Wallis, who filed a brief.

The contestant, Mr. Wallis, has received an undisputed majority of the votes cast in the State, outside the City of Baltimore, for the office of Attorney General. He avers and claims, that the election held in that City was rendered wholly void by fraud, intimidation and violence, so gross as to be notorious and universally conceded, and he therefore insists that the City vote, as officially returned, cannot lawfully be counted. He has accordingly appealed to the Governor, to hear evidence in support of his contention, which he avers his readiness and ability to maintain by proof. The returned candidate, Mr. Gwinn, does not pretend to deny the fraud, the intimidation or the violence charged, nor does he dispute the ability of the contestant to prove them. He contents himself with saying in general language in his brief, that "he believes that he was, in fact, elected to the office of Attorney General, by a large majority of the people of the State." The Governor officially declares, that "according to the returns" Mr. Gwinn has been elected, but that in his (the Governor's) opinion, there is ground for going behind the returns, and that he will proceed to do so and hear evidence, if he is authorized thereto by the Constitution. Mr. Gwinn does

not deny that there is reason for going behind the returns, but insists that the Governor is bound by the face of the returns to give him his commission and has no power now, or at any other time, to enquire or determine whether the returns are true or false, or whether the election in the City was void or valid. He claims this to be the law, even if the election was in fact a nullity, and if the vote set forth in the returns from the City was demonstrably fraudulent and illegal as alleged. It is admitted, that if the Governor cannot entertain the proposed contest no one else can, and the proposition of the returned candidate therefore nakedly is, that the highest law officer of the State may be returned as elected, by gross and conceded fraud and violence, and that, under the Constitution and laws of this State, any person who is willing to accept such an office, on such terms, may compel the Governor, by *mandamus*, to give it to him.

This is the appellee's case here. It is hardly venturing too much, to say that the doctrine thus asserted cannot in any event be recognized as law, except reluctantly, and under the pressure of irresistible demonstration, by the tribunals of any community whose institutions depend, for their existence, on the freedom and purity of the elective franchise.

Stated formally, the contention of the appellee is,

1st. That the duty of the Governor in the premises is wholly ministerial and not judicial.

2nd. That even if it is judicial, the Governor is precluded from attempting to discharge it, by reason of the failure of the Legislature to clothe him with the powers necessary therefor.

3rd. That even if the Governor's function is judicial, and the powers necessary for its exercise are implied in the constitutional grant, without need of legislation, the Governor is still bound ministerially to issue the commission to the appellee, in advance of any enquiry *dehors* the

returns, which he may feel it incumbent on him to make for the purposes of justice.

The counsel for the appellant assert the direct converse of these several propositions.

1st. Then, are the power and duty of the Governor in the premises under the Constitution, ministerial or judicial? On this, of course, depends the jurisdiction of the Court, for the judiciary confessedly has no right to interfere, unless the duty involved be purely ministerial, not requiring or leaving room for the exercise of judgment or discretion on the part of the Executive. *Green vs. Purnell,* 12 *Md.,* 335-6; *Miles vs. Bradford,* 22 *Md.,* 185-6; *Magruder vs. Swann,* 25 *Md.,* 208-9; *Thomas vs. Owens,* 4 *Md.,* 230.

In the language of the Supreme Court of the United States, it must be a duty, " in respect to which nothing is left to discretion * * * a simple definite duty, arising under circumstances admitted or proved to exist and imposed by law." *Mississippi vs. Johnson,* 4 *Wallace,* 475; *Gaines vs. Thompson,* 7 *Wallace,* 353.

The duty of the Governor is prescribed by section 2 of Article 5 of the Constitution. The Article is headed " Attorney General and State's Attorneys," and the subheading, which embraces the section referred to, is that of " Attorney General." The section is in these words:

" All elections for Attorney General shall be certified to, and returns made thereof by the clerks of the Circuit Courts of the several counties, and the clerk of the Superior Court of Baltimore City, to the Governor of the State, *whose duty it shall be to decide on the election and qualification of the person returned;* and in case of a tie between two or more persons, to designate which of said persons shall qualify as Attorney General, and to administer the oath of office to the person elected."

The language here used seems to be as plain and unequivocal as perspicuity can make it. The Governor is

to "decide." Can this properly signify that he shall not "decide," but must adopt the decision of the returning officers, whether he assents to it or not? *Ex vi termini*, to "decide" is to determine something which is undecided. It involves the exercise of both will and judgment. It requires a judicial act to be done, an adjudication to be made. No lexicographer or legal writer ever gave any other meaning to the word. It can have none other, from either its etymology or its use. The appellee however insists that "to decide" means to accept and be bound by the returns, no matter how false in fact, provided they be correct in form. If this be true, the Governor has no authority to "decide" anything except the formal correctness of the returns. That being recognized, he is *functus officio* and he registers and obeys the decision of the returning officers, instead of considering or determining anything himself, as to the facts which they return.

But the Constitution expressly says that it shall be his "duty" to "decide *on the election and qualification* of the person returned." That is clearly something more than deciding upon the formal accuracy of an official certificate, one would think. If it means anything, it means to "decide," to adjudicate, to determine, not whether the person in question is returned elected, but whether he has been actually elected and is qualified in fact. The certificate of returning officers never is conclusive, unless made so by express legislation. The duties of such officers are purely ministerial, unless they are declared by law to be judicial. *Cooley's Constit. Limit.*, (*Edit.* 1874,) 623, *and cases in note* 4.

In this State, they are notoriously neither judicial nor conclusive. How then can the merely ministerial act of such officers "decide" for the Governor, what it is made his "duty" to decide for himself? How can it be inferred, as the probable intention of the Constitution, that they should be authorized to compel his conscience and his

decision, when their own functions are simply clerical and they can neither decide nor conclude anything themselves? How can the fact that they are required by the Constitution merely to "certify" the election and make returns thereof to the Governor, whose duty it shall then be to decide on the election and qualification of the party returned as elected, oblige the Governor to forego any decision of his own on either of these points? Can the Attorney Generalship have been possibly selected, out of all the State offices, as the only one concerning which the returns are to be taken as conclusive, and that too by the tribunal whose special duty it is to decide on the election?

These questions seem to answer themselves and in but one way. When the Constitution declared it the "duty" of the Governor to "decide," it could not have intended to prohibit him from deciding.

*Further.* The meaning of the word "decide," if it were not otherwise obvious, would be plainly determined in this case by the enumeration of the things to be decided. The Governor is required by the Constitution to "decide" on the "qualification" as well as the "election" of the person returned. "No person shall be eligible to the office of Attorney General, who is not a citizen of this State and a qualified voter therein, and has not resided and practiced law in this State for at least ten years," (*Constit., Art. 5, sec.* 5.) Therefore it is the constitutional duty of the Governor to "decide on" the question whether Mr. Gwinn possesses the three qualifications thus required. No body will pretend that the returning officers have any authority to decide that question, or to send up any certificate concerning it. The returns give the Governor no information whatever by which he can determine it. There is consequently no escape from the conclusion, that the Governor is to "decide on" something outside of the returns, and in which he cannot possibly be controlled by the returns. That something is

a question of fact, which must depend entirely on testimony for its solution. The Governor can only decide the question by an adjudication of fact—a "judicial" act, in the technical as well as the obvious sense. The word "decide" being applied, in the same sentence and member of the sentence, to the election as well as the qualification of the person returned, and no distinction being suggested, by the Constitution, between the deciding in the one case and the deciding in the other, it follows, as an unavoidable consequence, unless every settled rule of interpretation be subverted, that the Governor is commanded to intervene, judicially, in both cases alike. Indeed the Governor states in his answer, as he stated in his official opinion, that he has already "decided" that Mr. Gwinn was qualified and eligible. If he had not so decided, Mr. Gwinn would have no standing in Court, and he is therefore only in Court by virtue of the Governor's having exercised the identical "judicial" function which his whole contention denies that the Governor possesses.

Nor is this all. The very words in dispute are fixed in their meaning by other clauses of the Constitution in which they appear. Art. 5, sec. 8, requires all elections of State's Attorneys to be certified and returns thereof made to the Judges of the counties and city having criminal jurisdiction, "whose duty it shall be to decide upon the elections and qualifications of the persons returned." No one can be so bold as to suggest that the duty thus imposed upon these Judges is ministerial and not judicial. No one can contend that they are bound by the returns, and that their function is limited to a blind adoption of the figures certified. This being clear, why do the identical words which make their duty judicial, make the duty of the Governor merely ministerial? Again. By Article 3, sec. 19, of the Constitution, "each House (of the General Assembly,) shall be judge of the qualifications and elections of its members." By section 12 of Article 4, the House of

Delegates, in certain cases of election of judges, clerks, &c., the House of Delegates is required to "judge of the election and qualification of the candidates at such election." With the exception of the word "judge," instead of "decide," which latter is, if anything, the stronger word, the provisions are identical with that referring to the Governor in the case of the Attorney General. And yet who ever heard that the House acts ministerially in such case, and is bound by the official returns? This Court most emphatically repelled such a pretence in the case of *Brooke vs. Widdicombe,* (39 *Md.,* 386, 404.) The power to judge, says Mr. Chief Judge BARTOL, is "the exclusive power and jurisdiction to go behind the election returns, to examine into the qualification of voters, purge the ballot-box and recount the votes." If that be not a judicial power and function, it is hard to imagine any that can be. And if the Legislature derives that power and function from the words quoted, is there any room for question that the same or stronger words confer the same power and function on the Governor, in the case at bar?

The Governor's duty then is judicial and not ministerial, and unless there be something in the point made, that the returned candidate is entitled to his commission, pending the Governor's decision as to his election, the Court below had no shred of jurisdiction and its order must be reversed.

But it is contended by the appellee, 2ndly, that even if the appellant's views of the power of the Governor be adopted, he is still disqualified from exercising them by the failure of the Legislature to pass laws necessary and proper to enable him to do so. If this point were conceded to be well taken as matter of law, it is difficult to perceive its relevancy to the case before the Court. If the Governor's power and duty under the Constitution are judicial, it is altogether impossible for the Legislature to alter their nature, and make them ministerial, by a neglect of its own duty. This Court would be none the less a Court, if

the Legislature were to cripple or nullify its judicial functions by repealing the laws which render their exercise practically possible. So, if the function of the Governor, to "decide on the election," be a judicial function, under the Constitution, no act or omission of the General Assembly can possibly make it anything else. Whether it can be exercised is one thing, but, whether exercised or not, it is still the same function, and if it be a judicial function it is beyond the jurisdiction of the Courts, no matter how completely the Legislature may have withheld the machinery for its exercise. If the Executive were required, by process of *mandamus*, to exercise his judicial function, he might well and effectively reply, if it were true, that the failure of the Legislature to do its duty had rendered it impossible for him to do his. But such failure could not convert a judicial into a ministerial function, or give the Courts jurisdiction to issue a *mandamus* where they otherwise would have none.

But the point is not well taken in law. Constitutions are not statute books, and from their nature and brevity they exclude details. It is therefore the universal rule that where they enjoin a duty, every particular power is implied which is necessary for its fulfilment. It would be an absurdity to say that an officer *shall* do an act, and deny him, in the same breath, the means of doing it. As a rule therefore, the implication of power is in proportion to the necessity of having it, in order to discharge the duty imposed. If it is an indispensable power, the implication is necessary and therefore irresistible. Such is doubly the rule where Constitutions are submitted to the people for ratification, and where, as this Court has so often decided, they are not to be construed technically, but in the sense in which the untechnical and common mind was most likely to have understood them. No untechnical mind, it may safely be asserted, could ever have concluded, that where the Governor was commanded, in terms, to decide on

the election of a candidate, he was not, *ipso facto*, clothed with the means of doing so. · It requires a mind to be educated up to such an idea. Nothing would have more astonished the voters, on either side, at the recent election for Attorney General, than to have been told that if they were cheated out of an honest majority, the constitutional power and duty of the Governor to set things right could be paralyzed by a *mandamus*. If they had been so told, in advance, it would have set a premium on violence and fraud.

The rule of implication above stated is recognized by the highest authorities and disputed nowhere, by Courts or elementary writers, so far as the research of the appellant's counsel has been able to go. See *Cooley on Constit. Limitations*, (*Edit. of* 1874,) 63, 69, 78, 79 ; 1 *Story on the Constitution*, secs. 430 *to* 435, 424, 419 *and* 1064 ; *McCulloh vs. Maryland*, 4 *Wheaton*, 316, 406, 407 *to* 421 ; *Martin vs. Hunter*, 1 *Wheaton*, 326 ; 1 *Kent's Commentaries*, 309.

" In the interpretation of a power," says Judge Story, " all the ordinary and appropriate means to execute it are to be deemed a part of the power itself," (sec. 430.) " If the end be legitimate and within the scope of the Constitution, all the means which are appropriate and which are plainly adapted to that end, and which are not prohibited, may be constitutionally employed to carry it into effect," (sec. 432.) " Whenever a general power to do a thing is given, every particular power necessary for doing it is included," (sec. 434.) It is in fact but the time-honored maxim of the common law, "*ubi jus, ibi remedium*," expanded into the proportions which belong to a canon of constitutional construction.

Nor is this principle of implication applied less liberally in favor of executive than of legislative or judicial powers. Its application is as universal as the necessity which justifies it. It governs the interpretation of the Federal

Constitution, creating a government of delegated and enumerated powers, to the same extent and upon the same principles as that of the Constitutions of the States, where the attributes of sovereignty are intrinsic and their exercise is presumed. The entire penal code of the Union depends for its constitutionality upon mere implication, for there is no express grant of power to define or punish offences, except in a few enumerated cases. The whole post office department, with all the legislation, civil and penal, which controls it, is based upon the naked authority "to establish Post Offices and Post Roads." Ch. J. MARSHALL, 4 *Wheat.*, 417. The President of the United States derives his entire power to remove from office, as an implication from his power to appoint. 1 *Kent, 7th Ed.*, 310. His power to refuse and dismiss Ambassadors is implied from the grant of power to receive them. 2 *Story on Constit.*, sec. 1568. (And see as to other implied powers of the executive, *Id., ch.* 37, *passim.*) The implication is not made or raised in any case because it refers to one rather than another of the departments of government, but exclusively upon the principle, common to them all, which is laid down by Ch. J. MARSHALL, (4 *Wheat.*, 409,) that "powers given to the government, imply the ordinary means of execution." If the importance of the duty to be performed can strengthen, in any case, the applicability of this principle, surely it is strengthened here. The duty assigned to the Governor is one of paramount importance. The grievance of which the contestant complains is altogether belittled by regarding it as affecting the rights of the candidates only. It is a blow aimed at the very existence and freedom of the elective franchise, and involves the rights of the whole people. It cannot go unheard or unredressed without reproach to the institutions of the State. If the Governor has no power to redress it, that power, it is conceded, exists no where. Rather than tolerate a conclusion so anti-repub-

lican and scandalous, it would seem imperative to strain to its utmost, every recognized principle of constitutional interpretation.

Now what powers, necessary to the discharge of his duties, is it contended that the Governor does not possess and the Court cannot imply? He cannot, it is said, compel the production of evidence or the attendance of witnesses, neither can he administer oaths which it would be perjury to violate. Legislation, it is argued, is necessary to enable him to do these things, and there is no such legislation. But these things are not mentioned or alluded to in the Constitution, as part of the Governor's duty in the premises. He is not commanded to do any of them, and the Court cannot possibly reach the conclusion that he is bound to do any of them, except through the very doctrine of necessary or fair implication, which it is asked by the appellee to repudiate. Unless to "decide" implies, *ex vi termini*, the obligation of the Governor to do the things in question, as essential to decision, they are plainly not in the case. If they are essential to decision; if the Governor cannot "decide" without doing them; how is it possible to escape the conclusion, that the power to do them is involved and implied, as well as the obligation, and as part of it? Can the Court imply a duty which is not expressed, and thereby paralyze a grave executive function, and yet refuse, in the same breath, to imply the powers which alone will save that function from being a wretched nullity? The basis of the implication is its necessity only, and is one and the same in both cases. If the unexpressed duty is implied, because it is necessarily involved in the duty expressly prescribed, how can the unexpressed power be denied, which is equally necessary to the performance of both duties? The specific and the only legitimate function of implication, in legislative or constitutional construction, is to help and to forward, not to cripple or

destroy, and if there is any principle better established
than another, in all such cases, it is, that no construction
is admissible which will render null or nugatory the
enactment to be construed. *Smith on Constitutional Const.*,
secs. 485 *to* 489 ; *Cooley, p.* 58.

But it is argued that the power to summon witnesses,
&c., as above, is not to be implied here and cannot be
exercised by the Governor, without authority from the
Legislature, for the reason that it is not a power of the
class which pertain to the Executive. This argument
begs the whole question. When the Constitution clothed
the Executive with the power and imposed on him the
duty to "decide," it made the function of deciding an
Executive function, and every power necessary to perform
it became *ipso facto* a power pertaining to the Executive.
In *Crane vs. Meginnis,* 1 *Gill & J.*, 476, and *The Police
Case,* 15 *Md.*, 459, this Court expressly repudiated the
notion that the legislative, executive and judicial depart-
ments were necessarily to be separated, altogether, in the
distribution of constitutional powers. The clause appar-
ently to that effect, in the Declaration of Rights, was held
to do nothing more than forbid the encroachment of either
department, on the powers or duties assigned by the Con-
stitution to the others. And the Court too, in these cases,
was construing legislative provisions merely, and not
constitutional clauses which are a rule to themselves.
The Constitution therefore, having imposed on the Gover-
nor the obligation to "decide on the election and quali-
fication" of the Attorney General, he is not to be shorn
of the powers essential to the performance of that duty,
by the suggestion that they are not executive powers, and
cannot be implied in his favor. They are his constitu-
tional powers, no matter what they might be called in a
treatise on government, and his right to exercise them
flows from their being such, and is implied from the fact
that they are absolutely necessary to enable him to do

what he is commanded. The implication arises altogether from the function to be performed, and not at all from the theoretical or formal classification of the functionary who is to perform it. Nor can the constitutional command be made a nullity, by saying that the powers which are needed to obey it, do not pertain to the sort of officer on whom the Constitution has seen fit to impose it. The people, in adopting the Constitution, have been pleased to settle that question for themselves, and wherever they have assigned a duty, there the necessary powers pertain and were meant to pertain.

But why should not the Executive, as such, have the implied right to summon and swear witnesses, &c., &c., in a matter which he is to hear and determine? These things are not out of his province in any way. It is made his duty for instance, by the Constitution, *Art.* 2, *sec.* 18, " semi-annually, and oftener if he deem it expedient, to examine under oath, the Treasurer and Comptroller on all matters pertaining to their respective offices ; and inspect and review their bank and other accounts." How can he examine the officers designated, under oath, if he has no power to administer an oath or direct it to be administered? What is the oath worth, (on the theory of the appellee,) if it be not perjury to violate it? How can the Governor inspect and review the accounts, if he has no power to compel their production? How swear the Comptroller or the Treasurer, if he has no compulsory process to bring them before him? And yet there is no statute making provision for these cases. But who imagines that the Governor is powerless on that account? And look at the plain analogies and interpetation furnished by the Constitution itself.

It is the Governor's duty to "decide on the election and qualification" of the Attorney General. " Each House shall be judge of the qualifications and elections of its members." (Art. 3, sec. 19.) When there is a con-

tested election for Judges, Clerks, or Registers of Wills, the House of Delegates is empowered "to judge of the election and qualification of the candidates." In neither of these cases, does the Constitution declare in what manner the tribunal appointed to judge or decide shall arrive at its judgment or decision. If it can only do so by summoning witnesses, compulsory process, &c., &c., that conclusion must be implied and follow from the language used, and must be the same in all the enumerated cases, the language being substantially the same in all. If the power to summon witnesses, &c.; be implied in one case, it must be implied in all. That the Senate and House have exercised the power to summon and swear witnesses, in cases of contested elections of their own members, from the beginning of the Government, is matter of notorious history, and yet the sections of the Code under which contested elections are conducted now, (Art. 35, sec. 55, &c.,) were not enacted until 1844. Down to that time, both Houses acted altogether under the power implied from their authority to "judge." Even now, the law does not operate as a grant of power to the Houses respectively, but only as prescribing a convenient mode in which they may be relieved from the burdensome duty of taking the testimony orally before their committees. The Act of 1844, ch. 84, now embodied in the Code, distinctly recognized the power in question as existing prior to and without legislation, for its 8th section provided, in terms, that the Act should not apply to cases pending. The 52nd section of Article 35 of the Code, while it enacted that all contested elections for Comptroller and Commissioner of the Land Office, should be "decided" by the House of Delegates, did not provide for the taking of testimony, &c., in such cases. This was not done until the Act of 1865, ch. 143, which added the elections for Judges, Clerks and Registers to the jurisdiction of the House. Consequently, in 1860, in the well

known contests of *Jarrett vs. Purnell,* for the Comptroller-ship, and of *Kerr vs. Gaither,* for a Clerkship, the proper House Committee, by virtue of the inherent powers which the House had always exercised, had the witnesses brought before it and sworn, and took all the needful testimony, orally and publicly. Nobody disputed the right then, or ever until now. It has been attempted to weaken the effect of these precedents by the suggestion, that the House of Delegates, being the grand inquest of the State, has the power as such, to "enquire into all complaints, grievances and offences," on "the oath of witnesses." (Art. 3, sec. 24.) It might be sufficient to say in reply, that contested elections generally, (whatever may be the fact in this case,) do not belong to the domain of the grand inquest. But, whether they do or not, the Senate is no part of the grand inquest, and yet it summoned witnesses, and compelled their attendance and administered oaths to them in contested election cases, precisely as the House did, for fifty years before any law was passed professing to give it authority to do so. Both Houses exercised these powers as derived from and necessarily incident to their constitutional authority to "judge." If the existing law was repealed, they would so exercise them again. How then is it possible to deny that the same words of grant, from which both Houses have derived their powers from time immemorial, confer the same powers on the Governor? He is to "decide"—the Houses are to "judge." If they can summon and swear witnesses, &c., as part of their jurisdiction, and implied from it, why cannot he, as part of his? Why do not the same words, on the same subject, in the same Constitution, mean and imply the same thing for the Executive as for the Legislature? Surely the powers in question pertain no more to the Legislative than to the Executive Department, in the nature of things, and if they pertain, in law, to the one, by virtue of certain language, how can it be contended that they do not apply to

the other, by virtue of the same language? This Court, in the case of the *State vs. Jarrett & Harwood*, (17 *Md.*, 309,) recognized the decision of the House of Delegates, in the contested election case of *Jarrett & Purnell*, as binding and conclusive, although the House arrived at it upon the testimony of witnesses, whom it had no express authority of law, as has already been stated, to summon, examine or swear. How then can the Court hold that the Governor can make no decision here, under a power granted in the same words, merely because he lacks the identical statutory authority, which the House lacked also?

Whether an oath, taken falsely before the Governor, in such an examination as the contestant proposes, would be punishable as perjury, depends simply upon the question, whether the Governor has the implied power to administer it. A power implied, in law, is as actual and efficient as if expressly granted in the amplest language, (1 *Black*, 61 ; 1 *Wallace*, 220,) and it will hardly be contended that a power derived from the Constitution directly is less efficacious, for any legal purpose or consequence, than a power conferred by statute. It is, therefore, reasoning in a vicious circle, to argue that the Governor has not the power to administer an oath guarded by the penalties of perjury, because the penalties of perjury cannot accrue in consequence of his not possessing that power. Concede the power, and all the legal and penal consequences follow, as matter of course. "Perjury," says Hawkins, (1 *Pl. Cr. Ch.*, 69, *pp.* 318, 319,) "by the Common Law, seemeth to be a wilful false oath by one who being carefully sworn to tell the truth *in any proceeding in a course of justice*, swears, &c." The words, *"course of justice,"* have been misquoted by Russell and some subsequent writers as *"courts of justice,"* and the false impression has been created, that perjury cannot be committed at Common Law, except in a strictly judicial proceeding. But the error is now recognized and re-

pudiated. 2 *Bishop Crim. Law, sec.* 1015 *and notes:
Roscoe's Crim. Ev.*, *sec.* 672, *note.*

The right to administer the oath is the test, and not the character of the officer nor the nature of the proceeding. It needs only to be a "lawful oath"—an oath "required in the regular administration of justice, *or of civil government*," to be perjury if false. 3 *Greenleaf Ev., secs.* 189, 190 ; *Alexander's Br. Statutes in Md.,* 766.

"An oath, says Lord COKE, is an affirmation or denial * * * * before one or more that have authority to give the same." (3 *Instit.*, 165.) "Persons legally entrusted with a power to take it," says Hawkins, or having "legal authority for their so doing." (1 *Hawk. Pl. C. Ch.*, 69, *sec.* 4, *p.* 351 *of* 6*th Edit., Dublin,* 1788 ; *Cro. Eliz.,* 135, 647 ; *Noy,* 100, 2 *Conn.*, 43 ; 11 *do.*, 408 ; 4 *McCord,* 165 ; 20 *Ohio,* 330 ; 3 *Cranch C. C.,* 293.

Whatever is perjury at Common Law, is perjury in Maryland. (1 *Code, Art.* 30, *sec.* 155.)

And even if false swearing should not amount technically to perjury in any case, yet wherever it is "prejudicial to justice," it is punishable as a misdemeanor at Common Law. 3 *Whart. Crim. Law, sec.* 2198; 8 *East,* 372 ; 1 *Bish. Crim. Law, sec.* 468 ; 2 *do., sec.* 1029 ; 1 *Denison's C. C.,* 432 ; 7 *C. & P.,* 17.

But it is a plain *non sequitur* to argue that the right of the Governor, or of any tribunal, to swear and hear witnesses, depends, in any degree, upon the liability of the latter to punishment for false swearing. If the law against perjury were repealed to-morrow, would the administration of justice come to an end? Would the functions of the Courts be annihilated *ipso facto?* · If they would not ; if the Courts could go on examining witnesses all the same, though there were no such thing as punishable perjury ; why should the Governor be precluded from taking the testimony of witnesses, merely because the penalties of perjury would not apply in their case? Chief Justice

MARSHALL in the case of *McCulloh vs. Maryland,* already cited, (4 *Wheat.,* 417,) emphatically disposes of the question. He classifies perjury with other offences, the punishment of which " is indeed *essential to the beneficial exercise* of a power, *but not indispensable to its existence.*" He speaks of it in connection with the crimes of stealing, and falsifying a record or the process of a Court, and says : " To punish these offences, is certainly *conducive* to the due administration of justice. *But Courts may exist, and may decide the causes brought before them, though such crimes escape punishment.*" The reasoning and authority of the Court, in the whole passage, are conclusive against the doctrine of the appellee, that the Governor cannot exercise his power at all, because appropriate legislation might enable him to exercise it better.

But it is said, in the brief of the appellee, that to imply the powers necessary to enable the Governor to perform his constitutional duty, would be to constitute him " an autocrat making rules, which have the power of law, at his pleasure," and would " clothe him with despotic power, &c., &c." If the people, in adopting the Constitution, had really seen fit to make the Governor a despot, by empowering him to decide upon the election and qualifications of the Attorney General, it is not perceived that the judiciary would have had the right, under the same Constitution, to make him anything else. But does the implication of powers claimed by the contestant involve any such awful and unprecedented consequences? Certain contested elections are required by the Code and the Constitution to be decided by certain of the judges, precisely as the Governor is to decide in the case at bar. And how? " Each Judge," says the Code, (Art. 35, sec. 54,) " may adopt such mode of proceeding, and prescribe such rules for taking testimony and adjudging costs as to him shall seem most satisfactory, and least expensive." Now this is the identical and not very enormous power, neither more

nor less, in substance or description, which it is claimed on the part of the contestant that the Executive of the State is clothed with, by necessary implication from the duty imposed on him.   Are the Judges autocrats or despots? If not, why not?   If they are, the law affords no greater security than the Constitution, for the law has made them such.   Is it pretended that power can be trusted to no department but the judiciary, and that the Judges can make any rules that are "satisfactory" to them, without danger of abuse, but that the liberties of the people are in peril, if the same discretion is left to the Executive? This Court has repeatedly repudiated any such assumption, and never more vigorously than in the recent case of *McBlair vs. Bond*, (41 *Md.*, 157.)   "The Governor and Senate," says the Court, "are alike the immediate representatives of the people, and whatever they do, in their official capacity, they do under a solemn responsibility to their constituents.   The Courts have no right to assume that there has been, or will be any undue and improper exercise of power by a co-ordinate branch of the Government."

The legislation by which the Code (Art. 42, sec. 13, &c.) assists the Governor in exercising his constitutional power (Art. 2, sec. 15,) to remove certain officers, for incompetency or misconduct, is set up as a supposed illustration of the necessity for similar legislation here.   Counsel can hardly contend, with seriousness, that the constitutional power of the Governor to remove for cause would have been inoperative, if the law referred to had not been passed, or that he would be stripped of it, if the law were repealed. They do argue however, that for him to exercise the power of removal, except under certain restraints and forms of law, would be anti-republican and arbitrary.   The force of such argument cannot much impress the Court, when it is remembered that from 1776, down to the Constitution of 1851, the Governor had the unrestricted power of removal without cause, in all cases, except where the tenure of

office was good behaviour, and that the President of the United States has the same power still.

But it is strenuously urged by the appellee, that the Constitution itself contemplated legislation as necessary for the exercise by the Governor of the power under consideration. No provision is referred to in support of this suggestion, except the 56th section of Art. 3, viz: "The General Assembly shall have power to pass all such laws as are necessary and proper for carrying into execution the powers vested by this Constitution, in any department or office of the Government, and the duties imposed on them thereby." This clause is mere surplusage. It does not add a jot or tittle to the powers or duties of the Legislature. They would have been the same without it, in all particulars. Such is the construction uniformly put upon the similar clause in the Federal Constitution, which has been held to be no grant of power in itself, and no enlargement of other powers, but "merely a declaration for the removal of an uncertainty" as to the powers of the Legislature, (2 *Story on Constit.*, secs. 1236 *to* 1243.) It is moreover manifestly illogical and impossible to deduce the necessity of legislation, in any particular case, from the mere power to legislate in cases where it may be necessary. The Constitution of 1851, contained the identical clause just quoted (Art. 10, sec. 2,) and it contained also the express provision, (Art. 3, sec. 20,) that " no money shall be drawn from the Treasury of the State, except in accordance with an appropriation made *by law.*" In the case of *Thomas vs. Owens*, 4 *Md.*, 189, this Court decided, nevertheless, that without any legislation under the general clause, or even any appropriation by law under the special clause, the Comptroller was entitled to his salary and to a *mandamus* to compel the Treasurer to pay it, by virtue of the mere phrase in the Constitution—"who" (referring to the Comptroller,) "shall receive an annual salary of $2500." Surely, the interest of the public does not require

a narrower construction, where the powers invoked are necessary to the discharge of a grave official duty, than where the only point in question is that of collecting official compensation. If the Constitution was self-executing, and "made the appropriation," as was said in *Thomas vs. Owens, p.* 227, why did it not grant. the powers in this case, when it imposed the duty requiring them? Here, as there, if the constitutional grant were impotent without legislation, the constitutional power and function "would exist only by the permission of the Legislature." *Id. Ib.*

So much for the point that the duty and power of the Governor are made futile by lack of legislation. As has already been said, its decision in favor of the appellee cannot possibly prevent a reversal, because the duty of the Governor does not cease to be judicial by reason of the failure of the Legislature to provide the means for its performance. Being judicial and not ministerial, it is beyond the power of the Courts and *mandamus* will not lie to control it.

3. The only ground therefore of jurisdiction, if there be any, must be sought for in the claim of the appellee to his commission, on the *prima facie* case made for him by the returns. The proposition plainly stated, is: that although the illegalities charged by the contestant may be truly charged; although the Governor is required by the Constitution to decide whether the appellee is elected and qualified: although the Governor shall determine (as he has done in this case) that there is reason for his going behind the returns to enquire into the facts, before he decides whether the appellee is or is not lawfully elected: he is nevertheless bound to issue the commission, against his will and before he decides, provided only the single fact exists that the returns are in due form. Such a proposition, it is respectfully submitted, is too unreasonable for countenance, unless there be some positive enactment

compelling its adoption. Is there any such? None has been suggested, except the 11th section of the 4th Article, as follows:

"The election for Judges hereinbefore provided, and all elections for clerks, registers of wills and *other officers, provided in this Constitution,* except State's Attorneys, shall be certified, and the returns made by the clerks of the Circuit Courts of the counties, and the clerk of the Superior Court of Baltimore City, respectively, to the Governor, *who shall issue commissions to the different persons for the offices to which they shall have been respectively elected:* and in all such elections the persons having the greatest number of votes shall be declared to be elected."

The Attorney General being one of the "other officers provided in the Constitution," it is argued that this case is in terms within the scope of its provisions. Clearly, of course, it would be, if there were nothing else in the Constitution on the subject. But, equally clearly, such is not the fact. Section 3, of Article 5, already quoted, directs as matter of separate and distinct enactment, that "all elections for Attorney General shall be certified to, and returns made thereof, by the Clerks of the Circuit Courts of the several counties, and the Clerk of the Superior Court of Baltimore City, to the Governor of the State." Then, instead of adding the words contained in the 11th section of Article 4, viz: "who shall issue commissions," &c., the third section of Article 5, omits those words, and substitutes for them the other and directly opposite words: "whose duty it shall be to decide on the election and qualification of the person returned." It is difficult to conceive how the framers of the Constitution could have signified, in a more positive and unequivocal manner, that in the one class of cases the Governor should issue commissions forthwith, and in the other case, he should first decide upon the election and qualification of

the Attorney General.   This conclusion is rendered more unavoidable, if possible, by the further fact, that the 11th section of Article 4, goes on to provide, that "in all such elections, the persons having the greatest number of votes shall be declared elected," while in the section relating to the Attorney General those words are entirely omitted. In the cases of all officers except the. Attorney General, the functions of the Governor are purely ministerial, and he has nothing whatever to do with the decision of their election or qualification.   In the case of the Attorney General alone, he has to make that decision himself.   It consequently accords with reason, that he should issue the commissions at once in the former class of cases, and let questions be raised thereafter, if any there be, before the tribunals appointed to decide them.   It does not accord with reason, that where he is himself required to decide, he should first issue the commission on a *prima facie* case, and then proceed to consider whether it ought to have been issued.

It is a well established principle, that a specific provision for a particular case, in a Constitution or a statute, withdraws that case from the operation of a general clause which would otherwise include it.   There is no need that the clauses should be antagonistic or incompatible, as is required where one clause is resorted to to destroy another ; for the rule referred to does not rest on their antagonism, but on the familiar ground, that the particular case would not have been segregated and provided for, if it had been regarded as embraced in the general provision.   The particular is treated not as destroying the general clause, but only as creating an exception to it.   *Sedgwick on Stat. & Constit. Law,* (last *Edit.*, 360, *and notes.*)   It is a question of intention merely. There is, for instance, no conceivable reason why the Constitution here should have repeated in the 3rd section of Article 5, as to the certifying and transmission of the

returns of the election of Attorney General to the Governor by the clerks, the precise language already used in section 11, of Article 4, in respect to the returns of elections of "other officers," unless it had been intended to provide for the case of the Attorney General, separately from and otherwise than that of those officers. The very fact that the particular follows the general clause, establishes that conclusion with double force. *Quick vs. Whitewater,* 7 *Ind.,* 570; *Carrington vs. McNickle,* 18 *B. Mon.,* 262. Perhaps, indeed, no better illustration could be given of the general rule than the case of the election of the Governor himself. He is certainly one of the "other officers," within the words and literal meaning of Art.4, sec. 11, and yet he is plainly not within its proper interpretation, inasmuch as the returns, &c. of his election are provided for elsewhere. *Art.* 2, *secs.* 2 *and* 3.

The reply of the appellee to this is, that there is a general scheme and purpose in the Constitution to have the commissions issued, at once, to all officers who are returned as elected, and to leave the decision upon their election and qualification to come afterwards, should these be contested or assailed. The Constitution, it is argued, should be construed accordingly, and all its parts be harmonized, by making the particular intent, in respect to the Attorney General, subordinate to the general intent expressed in Art. 4, sect. 11. This argument is directly in the teeth of the facts. Any such general intent is expressly negatived by Art. 4, sect. 11, itself, which excepts the prosecuting attorneys from the list of officers to whom commissions are to be issued and who are to be declared elected at once, on the mere faith of the returns. The functions and duties of the prosecuting attorneys, and the nature of their office, are nearest akin to those of the Attorney General. Their election and qualification are directed to be decided on by the judges having criminal jurisdiction, in their respective districts, in the identical

words which devolve the same duty on the Governor, in the case of the Attorney General. What ground of reason or policy can be imagined, for providing that the State's Attorneys shall stand apart from other State officers, and shall not be commissioned nor declared elected, until their election and qualification shall have been decided on, which does not apply, *a multo fortiori,* to their official superior, the chief law officer of the State? And why should such an exception be made in the case of any of the law officers of the State, except upon some ground of reason or policy, entirely at war with the general intent attempted to be set up?

But the Act of 1865, ch. 163, sec. 30, is supposed by the appellee to conclude the question, inasmuch as it provides that from the returns, made up and transmitted as it directs, "the Governor shall issue commissions to the different persons elected, including the Lieut. Governor." On its face, this Act, even if still operative, does not reach the case of the Attorney General. By the Constitution of 1864, Art. 5, sec. 2, as in that of 1867, and in the same words, the elections for Attorney General are required to be certified, and returns thereof made to the Governor by the *Clerks of the different Courts prescribed.* The Act of 1865, on the contrary, requires the returns to be transmitted to the Governor by *the Judges of Election,* and it is upon "the returns so made," and none others, that the Governor is directed to issue the commissions. Indeed, the section (30,) of the Act of 1865, is repugnant even to the Constitution of 1864, for it requires the returns to be made, in all cases, by the Judges of Election, and the commissions to be issued thereupon, in direct violation of Art. 4, sec. 14, and Art. 5, secs. 2 and 8, of that instrument, all of which assign that duty to the clerks, and require the Governor to act on their returns. For the same and for greater reason, the said section of the Act of 1865 is void, because "inconsistent" with (*Declaration*

*of Rights*, *sec.* 5,) and repugnant to the existing Constitution, in precisely the same regard. Indeed, if the Act of 1865 in the section (30) which is invoked by the appellee, were as valid, as it is manifestly invalid, under the Constitution of 1864, it must of necessity have died with that instrument. The returns for which it provides, are made (*sec.* 29,) subject to the taking of the "soldiers' vote," which the present Constitution excludes, and the commissions, which it requires the Governor to issue, are directed to be issued by him, "as provided by the 14th section of the 4th Article of the Constitution" of 1864. How a law which is required, in terms, to be executed as provided by a dead Constitution, can be itself alive, it is certainly not easy to perceive. Nor can its vitality be much aided by the manifest fact that it is inconsistent with the terms of the Constitution which now occupies the throne.

There is nothing therefore, in the pretension that the appellee is entitled to the commission, notwithstanding that he may not be entitled to the office.

*James A. L. McClure, Charles Marshall, Orville Horwitz, I. Nevett Steele* and *Charles J. M. Gwinn,* for the appellee.

The appellant, against whom the writ of *mandamus* was prayed by the appellee, decided that the returns by the several clerks of the election for Attorney General, had been certified to him by the respective clerks referred to in Article 5, section 2, of the Constitution of this State, and that, upon the basis of said returns, and according thereto, the appellee had received a majority of all the votes of the qualified voters of this State cast at the election for Attorney General, on the 2nd of November, 1875 ; and that the appellee was according to said returns, elected Attorney General of this State at said election.

Groome *vs.* Gwinn.

The appellant further decided, that the appellee was, on the day of said election, and still is, duly qualified for and eligible to the said office.

The questions to be considered are: 1st. Whether the appellant, under the provisions of the Constitution of this State, and under its existing laws, after having made these decisions, is not bound to issue, at once, a commission to the appellee, and to administer to him the oath of office as Attorney General.

2nd. Whether the appellant has the power, under the Constitution and laws of this State, before issuing the said Commission "to take evidence *dehors* the returns in relation to said election, and decide upon the evidence so taken, whether the appellee was, or was not elected Attorney General at said election."

The following provisions of the Constitution and laws of this State are applicable to the first question, that is to say, to the obligation of the appellant to issue at once a commission to the appellee.

The fifth Article of the Constitution provides as follows:

SEC. 1. "There shall be an Attorney General elected by the qualified voters of the State, on general ticket, on the Tuesday next after the first Monday in the month of November, eighteen hundred and sixty-seven, and on the same day, in every fourth year thereafter, who shall hold his office for four years from the time of his election and qualification, and until his successor is elected and qualified, and shall be re-eligible thereto, and shall be subject to removal for incompetency, wilful neglect of duty, or misdemeanor in office, on conviction in a court of law."

SEC. 2. "All elections for Attorney General shall be certified to, and returns made thereof by the clerks of the Circuit Courts of the several counties, and the clerk of the Superior Court of Baltimore city, to the Governor of the State, whose duty it shall be to decide on the election and qualification of the person returned; and in case of a

tie between two or more persons, to designate which of said persons shall qualify as Attorney General, and to administer the oath of office to the person elected."

Sec. 4. No person shall be eligible to the office of Attorney General who is not a citizen of this State, and a qualified voter therein, and has not resided and practiced law in this State for at least ten years.

The 11th section of the 4th Article provides as follows: "The election for Judges, hereinbefore provided, and all elections for Clerks, Registers of Wills, *and other officers*, provided in this Constitution, except State's Attorneys, shall be certified, and the returns made, by the Clerks of the Circuit Courts of the counties, and the Clerk of the Superior Court of Baltimore city, respectively, to the Governor, who shall issue commissions to the different persons for the offices to which they shall have been respectively elected; *and in all such elections, the person having the greatest number of votes shall be declared to be elected.*"

The 47th section of the 3rd Article provides as follows: "The General Assembly shall make provision for all cases of contested elections of any of the officers, not herein provided for."

The 56th section of the 3rd Article provides as follows: "The General Assembly shall have power to pass all such laws as may be necessary and proper *for carrying into execution the powers vested by this Constitution in any Department, or office of the Government, and the duties imposed upon them thereby.*"

The Constitution of Maryland is the organic law of the State. The same rules of construction apply to the Constitution of a State, which apply to every Act of Assembly. *Webster vs. Cooper,* 14 *Howard,* 488, 544. The way to expound clauses in the instrument is to compare them with other parts, and to construe all such parts together, (*Campbell vs. Morris,* 3 *H. & McH.,* 535; *State vs. Jarrett & Harwood,* 17 *Md.* 309,) by the light afforded by the

laws existing at the adoption of the Constitution, and the practice under them. *State vs. Wayman*, 2 *G. & J.*, 285 ; *Mayor and City Council vs. State*, 15 *Md.*, 458 ; *Bradford vs. Jones*, 1 *Md.*, 369 ; *Bandel vs. Isaac*, 13 *Md.*, 222.

In this case, therefore Article 4, sect. 11, and Article 5, sec. 2, cited above, must be construed together, and read as if they were parts of the same provision ; and both sections must be construed by the light afforded by the Act of 1865, chap. 143, section 30.

Under the sections and Articles of the Constitution, cited, it became the duty of the appellant, when the election of November 2nd, and the returns thereof by the respective clerks, were certified and made to him, to examine the said returns and see that such certificates were plain and distinct statements of the number of votes given for each candidate, voted for on general ticket at said election; and whether they were substantially in the form required by sections 27 and 28 of Article 35, of the Code, and by the Act of 1865, chapter 143.

The decision of the Governor necessarily admits that all of said returns, or at least that so many of them, as sufficed to sustain his decision, were in due form, and that, according to such returns, the appellee received a majority of the votes cast for the Attorney General at said election. The presumption, therefore, of law is that so far as the returns were concerned, *"omnia rite esse acta."* *State vs. Mackall*, 11 *G. & J.*, 456, *Ragan vs. Gaither*, 11 *G. & J.*, 472 ; *Kerr vs. Trego*, 47 *Penn. State Rep.*, 292 ; *McCrary's American Law of Elections*, 150 ; *U. S. vs. Crusell*, 14 *Wallace*, 4 ; *Pendleton County vs. Amy*, 13 *Wallace*, 305.

Under the Constitution of 1864, an Attorney General was provided for. Article 5 of Constitution of 1864. Sections 1 and 2 of Article 5 of the Constitution of 1867 are literal transcripts of sections 1 and 2 of Art. 5 of the Constitution of 1864.

The Act of 1865, chapter 143, section 30, provided that the presiding judges of election, when assembled as directed

by that Act, should "cast up the whole vote of all the districts or precincts, and shall make out two plain, fair and distinct statements and certificates of the number of votes, which shall have been given for each candidate, for each of the officers voted for at said election, including, Lieutenant Governor, one of which certificates shall be delivered to the clerk of the Court to which they are directed to make their returns, and the other, except in elections for Governor and State's Attorneys, shall be transmitted by mail to the Governor; and in case of elections for Governor and State's Attorneys, the said statements and certificates, instead of being transmitted to the Governor, shall, in case of Governor, be transmitted to the Secretary of State; and in the case of State's Attorneys, shall be transmitted to the Judge of the Court having criminal jurisdiction in the circuit in which State's Attorneys are respectively elected; *and from the returns so made, the Governor shall issue commissions to the different persons elected, including the Lieutenant Governor, as provided in the fourteenth section of the fourth Article of the Constitution of this State.*"

The Court will observe that the direction to the Governor to issue commissions *on the basis of the returns,* is a mandatory clause, and that the words "as provided in the fourteenth section of the fourth Article of the Constitution of this State" are simply expressive of the sense of the Legislature that such was the intent of that particular provision of the Constitution.

There can be no question as to the power of the Legislature to make this mandate, because the Constitution of 1864, Article 3, section 46, authorized the General Assembly to make provision for all cases of contested elections of any of the officers not provided for in that instrument. The determination that the person *prima facie* elected should receive the commission was a partial exercise of this power, because it laid down as a primary rule, which was to be the basis of all legislation in contested elections,

that the persons shown by the returns to be elected should be admitted to their respective offices before any contest took place.

The Act of 1865, chapter 143, section 30, just cited, has never been in any wise altered or repealed, except in so far as said section 30 was modified by the omission in the Constitution of 1867 of the office of Lieutenant Governor. In every other particular the section remains completely operative. The direction to the Governor to issue commissions to the different persons elected remains in full force and is precisely applicable to the 11th section of the 4th Article of the Constitution of 1867. For this section is substantially a transcript of the 14th section of the 4th Article of the Constitution of 1864 referred to in the Act of 1865, chapter 143, section 30.

The Act of 1865, chapter 143, section 30, was not repealed by the Constitution of 1867, because the effect of the reference made in the Act to the 14th section of the 4th Article of the Constitution of 1864 *was to incorporate that provision of the Constitution of* 1864 *in the body of the Act. Turney vs. Wilton,* 36 *Illinois,* 385 ; *Sedgwick on Stat. and Const. Law,* (2nd ed.,) 229. The Act of 1865, chapter 143, section 30, was only modified by the Constitution of 1867 in the single necessary particular of dispensing with any return of the election of Lieutenant Governor, since that office has ceased to exist. In other respects it is continued in force by the general provision of Article 5 of the Bill of Rights of the Constitution of 1867. *Bandel vs. Isaac,* 13 *Md.,* 222 ; *Cass vs. Dillon,* 2 *Ohio State Rep.,* 609.

It was, therefore, the express duty of the Governor under the Act of 1865, chapter 143, section 30, *upon the returns made to him,* to issue a commission to the appellee as Attorney General, as provided in the 11th section of the 4th Article of the Constitution of this State ; for that section was, in fact, a re-enactment in the organic law, the Constitution of 1867, of the provision made by the 14th section of the 4th Article of the Constitution of 1864.

The Act of 1865, chapter 143, section 30, was, as has been said, a partial exercise of the power given to the General Assembly by Article 3, section 46, of the Constitution of 1864, to make provision for all cases of contested elections of any of the officers not provided for in said Constitution. And it remains as a partial exercise of the same power, vested in the General Assembly under Article 3, section 47, of the Constitution.

This Act of 1865, chapter 143, section 30, therefore determines that the Governor was bound, under Article 4, section 11, of the Constitution of 1867, in case of an election for any office provided for in that Constitution, except State's Attorneys, to declare that person elected to such office whom the evidence afforded by the returns showed had received the greatest number of votes, and to issue to him a commission.

The 2nd sec. of Art. 5 of the Constitution of 1867 affords by itself, and also when compared with other provisions of the same instrument, conclusive proof that it was not intended to provide by the operation of its own terms for a contested election. For while Art. 4, secs. 11 and 12 provided not only for the commissioning the officers there named who were returned as elected, but also for cases where said elections were contested, the 2nd sec. of Art. 5 provides only for deciding upon the election and qualification of *the person returned.* There is not a word in the whole of Art. 5 of the Constitution of 1867 from which the inference can be drawn that it was intended to give any person a right to contest that return before the Governor, and to claim that such person was elected. *Under that provision no person, except the person returned,* can be considered by the Governor in connection with the returns so made. It was plain that it was intended that the Legislature should, under the power conferred upon it by Art. 3, sec. 47, and Art. 3, sec. 56, make provision for the case of a contest for the office of Attorney General.

The Constitution of 1867, in Art. 3, sec. 47, recognizes that it had made no provision for certain cases of contested election which might arise under that Constitution; and, among the omitted cases, the office of Attorney General must certainly be reckoned. As if to mark by special language its purpose, that in such omitted cases, or in other cases where a power was conferred, or a duty enjoined, there should be no resort to *implications* of authority, but only to such provisions of law as the Legislature might see fit to make, and, above all, that no Governor, or other tribunal not described in the Constitution as a judicial power, (Art. 8 of Bill of Rights,) should attempt, under any *implication* of authority, to exercise judicial powers, it provided by Art. 3, sec. 56, that the General Assembly should have "power to pass all such laws as may be necessary and proper for carrying into execution the powers vested by this Constitution, in any Department or office of the Government and the duties imposed on them thereby."

If no such provision had been made by Art. 3, sec. 56, the necessary construction of sec. 2 of Art. 5 would have compelled this Court to decide that further legislation was necessary to give any operative effect to the general power lodged in the Governor by that section. All Constitutions and statutes, for the same rule of construction applies to both, which authorize summary proceedings by, and give extraordinary powers to Courts or officers, are to be strictly construed so far as regards all the steps and proceedings necessary to give jurisdiction. *Sedgwick on Const. Law,* (*2nd Ed.,*) 299. No Court of Justice is authorized in assuming that the Constitution intended that an office, conferred by the will of the people, expressed in the usual form, and evidenced in the manner prescribed by law, should be taken away by a form of trial for which the law of the land has made no provision.

No Court of Justice in this country will maintain that a power so repugnant to the common principles of justice

and civil liberty lurks under any general grant of authority, or ought to be implied from any general expressions of the will of the people. *Wilkinson vs. Leland*, 2 *Peters*, 657 ; *Cummings vs. State of Missouri*, 4 *Wallace*, 331; *Pierce vs. Carskadon*, 16 *Wallace*, 239.

It was the plain intendment of Art. 5, sec. 2, of the Constitution of 1867 that the Attorney General should, *so far as his commission was concerned*, be placed upon the same footing with other officers, and that provision should be made by law, thereafter, for the mode of conducting any contest for his office before the Governor. For what reason can there be to suppose that the Constitution intended that the Attorney General, plainly included in the general provision of Article 4, section 11, which requires the Governor to commission the officer upon the "*prima facie* result" afforded by the returns, *Magruder vs. Swann, Governor*, 25 *Md.*, 209; *Brooke vs. Widdicombe*, 39 *Md.*, 401, should be excluded from the operation of that provision by Article 5, section 2?

The Constitution in all its parts recognizes as proper the custom which prevails in every elective and representative government, of admitting to office those who have, *prima facie*, the right to enter upon the duties of such office. Can it be imagined that it intended to except the Attorney General alone from the operation of this general rule? Can it be supposed that the Constitution meant that a vote, which was sufficient to entitle a Comptroller to receive a commission from the Governor was not sufficient to entitle an Attorney General to a commission, although voted for upon the same general ticket with the Comptroller?

These observations, would seem to demonstrate that it was the absolute duty of the Governor, after making the decisions already mentioned, to have issued without further delay, a commission to the appellee, and to have administered to him the oath of office. It is this duty which ought to be enforced by the writ of *mandamus*.

The issue of a commission to the appellee, and the administration to him of the oath of office, upon the evidence afforded by those returns of election, which the Constitution makes *prima facie* evidence of the right of the person shown by them to have a majority of votes, does not in any way preclude the Governor from exercising his constitutional right to decide on the election of the person so returned, whenever the Legislature, in the exercise of its power under Article 3, sec. 47, and Article 3, sec. 56, of the Constitution, shall make proper provision for the contest of such an election.

Up to the present hour it has made no such provision. As the law now stands the returns made by the respective clerks form the only legal evidence upon which the Governor can act.

It is contended by those, who resist the right of the appellee to be sworn into office, that inasmuch as Article 5, section 2, of the Constitution of 1867, makes it the duty of the Governor to decide on the election and qualification of the person returned as Attorney General, a right is given to him by *implication* to use every particular power necessary to enable him to reach a decision on such election; and that he may, therefore, examine witnesses on oath or cause them to be so examined, and thus test the correctness of the returns made to him.

No argument was ever more palpably fallacious. Under Article 3, section 19, of the Constitution, each branch of the Legislature is made "judge of the qualifications and election of its members, as prescribed by the Constitution and laws of the State." This provision, taken by itself, is as broad and more express in the language used than the 2nd section of Article 5, which confers upon the Governor the right to decide upon the election and qualification of the person returned as Attorney General. But it is certain that, if no other power than that thus conferred by Article 3, section 19, was given by the Constitu-

tion or laws to the Senate and House of Delegates, the authority thus given *would have carried with it no implied power to examine witnesses upon oath in relation to such elections.*

That this proposition is true, is abundantly proved by the following citation from an American authority entitled to the highest consideration. "In this country, legislative assemblies have no authority, unless it is conferred upon them by law, to administer oaths to witnesses." *Cushing on the Law of Legislative Assemblies, page* 380, *section* 958 ; *see also page* 253, *section* 635. The House of Commons even, large as are its parliamentary powers, cannot, in deciding upon contested elections, examine witnesses upon oath. *Cushing on the Law of Legislative Assemblies, page* 380, *section* 956.

Each House of Congress is the judge of the election, returns and qualifications of its own members. *Constitution of United States, Article* 1, *section* 5. But, in the absence of laws giving to the Senate and House respectively, the direct power of examining witnesses in such cases upon oath, neither body would have such power. The legislation of Congress proves conclusively, that it is the universal judgment in this country, that no legislative body can, unless there be an express power given to it in the organic law, or by some statutory provision, examine witnesses upon oath. Such power was, therefore, given to the President of the Senate, the Speaker of the House of Representatives, to the chairman of a committee of the whole, or of any committee of either House of Congress, by the Act of Congress of May 3, 1798. A further provision for enforcing the attendance of witnesses, and compelling them to answer interrogatories, was made by the Acts of Congress of January 24, 1857, and January 24, 1862. (*Revised Statutes of the United States, page* 17.)

Congress, understanding in the beginning of our national history, that the power given by the Constitution to each

House, to judge of the election, returns and qualifications of its own members, carried with it no implied power to examine witnesses upon oath in relation to such questions, made, as it ought to have done, express provision by law for taking evidence in cases of contested elections, by an Act passed as early as January 23, 1798, and has since made further provision upon the same subject by the Acts of February 19th, 1851, and January 10th, 1873. *Revised Statntes of the United States,* 17.

Before the passage of the Act of 1844, chap. 284, now codified in 1 Code, Art. 35, secs. 53—56, the House of Delegates examined witnesses under the powers given to it by the Constitution of 1776, as the grand inquest of the State, (sec. 10 ;) and the Senate, when it sought to examine witnesses, was undoubtedly obliged to rely upon the contrivance of a joint committee of the two Houses, and upon the power of the House of Delegates to send for witnesses, a mode of proceeding grafted in express terms upon the Constitution of 1867, by Article 3, section 24.

Except for the power granted to the House of Delegates as grand inquest of the State, by the Constitution of 1776, by the Constitution of 1850, Art. 3, sec. 28, by the Constitution of 1864, Art. 3, sec. 23, and by the Constitution of 1867, Art. 3, sec. 24, the House of Delegates or Senate could not have examined, nor could examine any witness upon oath.

It was because it was realized that the power to do it by such means was inconvenient and imperfect, that the Act of 1844, ch. 284, already referred to, was passed. But it certainly was never pretended in this State or elsewhere, that the *single* power given to a legislative body to *judge* of the qualifications and elections of its own members, carried with it an *implied* power to summons witnesses, and to examine them upon oath in relation to contested elections.

If the House of Commons, the Senate or House of Representatives of the United States, the Senate or House of

Delegates of this State, or of any other State, each having power to judge of the election and qualifications of their respective members, cannot, without the express authority of positive law, examine witnesses upon oath in reference to any contested election, is it not extraordinary that it should be insisted, that such *implied* power can be deduced from those words in sec. 2 of Art. 5 of the Constitution of this State, which give to the Governor the single right to decide on the election and qualification of the person returned as Attorney General? He does not possess such a power.

Sec. 2 of Art. 5 of the Constitution of 1867, gives no such power. It is a self-executing section, in so far as it enables the Governor to decide upon the returns; but it gives him no other right. If there is occasion to go behind the returns, the Governor must wait until appropriate legislation is provided. *People vs. Highway Commissioners*, 15 *Michigan*, 351; and see, especially, *Ex parte Griffin*, 8 *Am. Law Register, New Series*, 365, CHASE, C. J.

If the 2nd sec. of the 4th Art. of the Constitution of the United States, commanding that a person held to service under the laws of any State, and escaping into another State, should be delivered up on claim of the party to whom such service was due, did not become operative without the aid of *legislation*, providing for the character of proof, when the claim was disputed, or without provision for the mode of delivering up the fugitive, (*Prigg vs. Commonwealth of Pennsylvania*, 16 *Peters*, 613, 614, 615,) how can it be pretended that sec. 2 of Art. 5 of the Constitution of 1867, implies a power in the *Governor* to provide for the character of proof, and the mode of trial, which he will adopt in exercising his authority? *Commonwealth of Kentucky vs. Dennison, Governor*, 24 *Howard*, 104, 105.

If the clause in the Constitution of Mississippi, prohibiting the introduction of slaves into that State, (*Groves vs.*

*Slaughter*, 15 *Peters*, 499-501, affirmed in *Rowan vs. Runnels*, 5 *Howard*, 138, 139, and in *Sims vs. Hundley*, 6 *Howard*, 6,) was not, in the opinion of·the Supreme Court, a self-executing clause, by implying all the powers needed to execute it, but required, on the contrary, legislation to make it operative, it is certain that Article 5, section 2, of the Constitution of this State, cannot be considered as operative without further legislation. If the clause in the Mississippi Constitution, required penalties only to carry it into operation, this clause requires everything. There is no obligation upon the Governor, to notify even the person *prima facie* entitled to the office, or the contestant—no provision for summoning witnesses or authorizing them to be summoned—no power to enforce their attendance, no provision under which they may be punished for perjury. If this is a self-executing clause, the Governor is an autocrat, making rules which have the form of law at his pleasure, and the person returned elected is wholly at his mercy. The Governor may, without any notice or without sufficient notice, and by peremptory proceedings, without legal evidence, and without any form of inquiry known to the law, dispossess him of an office to which he has been called by the voice of the people of the State. "These are questions," said the Court, in *Groves vs. Slaughter*, "not easily answered, yet they are proper circumstances to be taken into consideration, when we are inquiring into the intention of the Legislature in thus framing this Article." It is unreasonable to suppose, that if this power "was intended to operate without any legislative aid, *there would not have been some guards and checks thrown around it to insure its due execution.*" 15 *Howard*, 501.

The theory of our Government, State and National, is opposed to any construction of a State Constitution, from which it could be argued that such unlimited powers were deposited any where. *Loan Association vs. Topeka*, 20 *Wallace*, 663.

What right has the Governor to administer an oath to any supposed witness in this case, or to authorize any oath to be administered to such witness? No person has authority to administer an oath, unless he be legally empowered by law to do so. If a person who is legally authorized to administer some kinds of oaths, undertakes, under the color of such authority, to administer oaths in cases in which he is not authorized to do so, his action is simply void, *and the taking of such oath falsely is not perjury.*

The Governor of Maryland has no power under the Constitution, to examine any person under oath, except the Comptroller and Treasurer, in relation to matters pertaining to their respective offices; (Art. 2, sec. 18,) and to examine witnesses when, during the recess of the Legislature, charges are preferred to him against such officers for incompetency, malfeasance in office, wilful neglect of duty, or misappropriation of the funds of the State. (Art. 6, sec. 6.)

Although the Governor may remove for incompetency or misconduct, all civil officers who received appointment from the Executive for a term of years, (Art. 2, sec. 15,) yet he could not summon before him any witnesses to testify as to such complaint, or enforce the attendance of such witnesses, except for the provisions of 1st Code, Art. 42, sec. 13.

If, without having authority to administer oaths to witnesses, he proceeds to do so, and such witnesses swear falsely, they cannot be proceeded against for perjury. Code, Art. 30, sec. 155.

Perjury, *at the common law*, is a crime committed " when a lawful oath is ministered to any person, in a judicial proceeding, who sweareth absolutely and falsely in a matter material to the issue." 3 *Coke's Institutes, ch.* 74, *p.* 164.

" It seemeth clear that no oath whatsoever, taken before a person acting in a merely private capacity, or before those who take upon them to administer oaths of a public

nature without legal authority for their so doing, or before those who are legally authorized to administer some kinds of oaths, but not those which happen to be taken before them, or even before those who take upon them to administer justice by virtue of an authority, seemingly colorable, but in truth unwarranted and merely void, can ever amount to perjuries, in the eye of the law, because they are of no manner of force, *but are altogether idle.*" 1 *Hawkins' Pleas Crown, chap.* 57, *sec.* 4, (8*th English Ed.*,) 431. "Because no affidavit is any way regarded unless it be made before persons legally entrusted with a power to take it."—*Ibid.* See 4 *Stephen's Comm.*, 328, 329.

As it is clear that the Governor has no right to examine any witnesses under oath, or to require that the affidavit of such witness should be taken before any other person ordinarily competent to administer an oath, except in the cases already referred to, then it follows that if the testimony of any person was taken in the particular controversy now pending, it could not be considered, because it would not be legal evidence, For the Governor has not the right to administer an oath to such witness, and such witness could not be prosecuted if he swore falsely ; because the affidavit made by him was not one "*required by law to be taken.*" 1 *Code, Article* 30, *section* 155.

The Governor cannot direct depositions to be taken before some officer, ordinarily competent to administer an oath, because neither the Constitution nor the law of the State requires such affidavits to be taken by the persons who must swear to them in this case, (*Article* 30, *section* 155,) and no power is vested in the Governor to direct such depositions to be taken. Such affidavits, therefore, if taken, would amount only to *voluntary oaths*, for the taking of which no person could be prosecuted for perjury, however false such oaths might prove to be. Such sort of false swearing would not be perjury at the common law, or under *Article* 30, *section* 155, *of the Code.*

If, as has been suggested, the person elected should be considered *insane,* the Governor would not have the privilege of exercising his own judgment, or of taking the depositions of others upon this question, but would be obliged to have the fact of the *lunacy* tried before a jury, under proceedings had before a proper tribunal, and could act only on the formal inquisition thus made and returned and entered of record. He would not certainly have the privilege of treating the candidate as a *lunatic,* and refusing to commission him because any number of people who did not agree in opinions with the person elected, were satisfied that such candidate was unsound in mind, and were willing to say so upon oath, if their testimony could be received.

There can be no pretence that the Governor can delegate the duty of examining witnesses to any other person, even if it could be pretended, under Art. 5, sec 2, of the Constitution, that he had such right in his own person. If the Governor be a ministerial officer only, he cannot perform his constitutional duties by deputy. And if, as is pretended, he is authorized to discharge any judicial functions under the section in question, it is quite certain that he cannot delegate these to any other person. No person having judicial authority can act by deputy, or in any way transfer such power to another. 7 *Bacon's Abridg., Office and Officers, L.,* 317.

The citations, made on the other side, in support of that implied authority in the Governor to proceed with the taking of the testimony in this case, on which they rely, do not authorize the course which they ask the Court to pursue in this case. While the general rule may be that when " a Constitution gives a general power, or enjoins a duty, it also gives by implication every particular power necessary for the exercise of the one, or enjoyment of the other;" yet it is certain that "the implication under this rule must be a necessary, and not conjectural, or argumentative one." And it is also certain that the rule

in question "is further modified by another rule, that where the means for the exercise of a granted power are given, no other or different means can be implied as more effective, or convenient." *Cooley's Constitutional Limitations (2nd Ed.,)* 63. The only means as yet existing in this case are the returns of the election, upon which the Governor has already decided.

The duties of the Governor in this case, which remain to be performed, are executive and ministerial only. If he be an officer only, he must confine himself to the means granted to him for the exercise of his particular power, that is to say, to the returns, and upon these he has already acted. If he be an officer, having a *quasi* limited judicial power, he has certainly completed all that part of his duty which could possibly be considered as judicial in its character, because he has decided upon the returns which are the only legal evidence which he had a right to consider. He certainly has no other function to perform, which could be considered a judicial act. If, therefore, he is to be treated as possessing a *quasi* limited judicial power, he can be coerced to perform his duties, by the judgment of this Court, and be, by the same authority, restrained and confined within the proper limits prescribed for him by the Constitution and laws of this State. *Williamson vs. Carnan*, 1 *G. & J.*, 196.

BARTOL, C. J., delivered the opinion of the Court.

This is an appeal from a *pro forma* order of the Circuit Court, directing the writ of *mandamus* to be issued, requiring the Governor to commission the appellee as Attorney General and to administer to him the oath of office.

By agreement of counsel all errors of pleading have been waived, the only object and purpose of the appeal being to obtain a judicial determination of the powers and duty of the Governor, under the Constitution and laws of the State.

The nature of the questions involved, and the circumstances under which the appeal was heard, requiring an immediate decision, the judgment of the Court was promptly rendered, in which only our conclusions were expressed, reserving for the future a more full statement of the grounds and reasons upon which our decision rests.

The petition alleges, and the answer of the appellant admits, that the Governor had decided, that according to the returns of the election duly made and certified to him by the Clerks of the Circuit Courts of the several counties and the Clerk of the Superior Court of Baltimore city, the petitioner, Mr. Gwinn, had received a majority of all the votes of the qualified voters of the State, cast at the election for Attorney General, and that according to said returns the petitioner was elected Attorney General of the State; and that at the time of the election, as well as at the time of filing his petition, he was duly qualified and eligible to the office under the Constitution. The answer further states that the Governor had received notice that Mr. Wallis, who was also a candidate for the same office, contested the election of the petitioner upon the ground that, "the said election in the City of Baltimore, was rendered wholly void by fraud, intimidation and violence, and that the returns for said City, could not lawfully be counted, and that he, the said Wallis, received and was duly elected by a majority of the legal votes of the people of the State, exclusive of the City of Baltimore, for the office of Attorney General."

The answer further states that there appeared in the opinion of the Governor, a sufficient reason to induce a hearing and examination of the questions involved in the contest, by evidence outside of the returns, if he, as Governor, possessed such power under the Constitution, and that he had declined to issue a commission to Mr. Gwinn, as Attorney General.

The first question for our consideration, is whether it was the duty of the Governor, to issue the commission to Mr. Gwynn, notwithstanding the notice of contest from Mr. Wallis.

The provisions of the Constitution bearing upon this question are as follows:

*Article* 5, *sec.* 1, provides for the election of Attorney General, by the qualified voters of the State, fixes his term of office, as four years, &c. *Sec.* 4 prescribes the qualifications required to render a person eligible, viz: that he shall be a citizen of the State, a qualified voter therein and shall have resided and practiced law in this State for at least ten years. *Sec.* 2 is in the following words:

"All elections for Attorney General shall be certified to, and returns made thereof, by the Clerks of the Circuit Courts of the several counties, and the Clerk of the Superior Court of Baltimore City, to the Governor of the State, whose duty it shall be to decide on the election and qualification of the person returned; and in case of a tie between two or more persons, to designate which of said persons shall qualify as Attorney General, and to administer the oath of office to the person elected."

*Art.* 4, *sec.* 11, provides as follows: "The election for Judges hereinbefore provided, and all elections for Clerks, Registers of Wills, and other officers, provided in this Constitution, except State's Attorneys, shall be certified, and the returns made by the Clerks of the Circuit Courts of the counties, and the Clerk of the Superior Court of Baltimore City, respectively, to the Governor, who shall issue commissions to the different persons for the offices to which they shall have been respectively elected; and in all such elections, the person having the greatest number of votes, shall be declared to be elected."

*Art.* 3, *sec.* 47, provides that, the "General Assembly shall make provision for all cases of contested elections of any of the officers, not herein provided for;" and the 56*th*

*sec. of Art.* 3, provides that "the General Assembly shall have power to pass all such laws as may be necessary and proper for carrying into execution the powers vested by this Constitution, in any department, or office of the Government, and the duties imposed upon them thereby."

*The* 11*th sec. of the* 4*th Article* above cited, is the only provision to be found in the Constitution directing commissions to be issued by the Governor, to the several officers therein mentioned and referred to ; in all cases falling within its provisions, the Governor is required to issue commissions to the persons regularly and duly returned as elected. This is the plain meaning of its language, and such has been decided to be its true construction.

In *Brooke vs. Widdicombe,* 39 *Md.,* 402, it was held that the Governor would not be justified in refusing to issue the commission to the person regularly and duly returned as elected ; by reason of a notice that the election was contested ; that was a case of a clerk, one of the officers expressly named in the 11th section ; but the Attorney General though not expressly named, is clearly embraced within its terms, for after enumerating Judges, Clerks, and Registers of Wills, the words are, *"and other officers* provided in this Constitution, except State's Attorneys." If this section stood alone there would be no room for dispute or question. It is contended however, that this case is governed exclusively by the *second section* of the *fifth Article,* which relates particularly to the Attorney General, and which it is argued, has the effect to withdraw the case from the operation of the *eleventh section of the fourth Article.*

It is no doubt a familiar rule of construction, that where, "a general intention is expressed, and the instrument also expresses a particular intention which is incompatible with the general intention, the particular intention is to be considered as in the nature of an exception. *Smith's Commentaries, sec.* 652.

But this rule has no application here, because so far as concerns the duty of the Governor, to issue a commission to the person appearing by the returns to have been elected, there is nothing in the *second section of the fifth Article* repugnant to, or incompatible with the provisions contained in the *eleventh section of the fourth Article.*

As said by Judge CHASE in *Campbell vs. Morris,* 3 *H. & McH.,* 554, "the way to expound a clause in the Constitution is by comparing it with other parts, and considering them together."

In the language of Judge COOLEY, the rule applicable is "that effect is to be given, if possible, to the whole instrument, and to every section and clause. If different portions seem to conflict, the Courts must harmonize them if practicable, and lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory." *Cooley's Const. Lim.*, 58.

Construing these sections together, it seems to us perfectly clear to be the meaning and intent of the Constitution, that commissions should issue, so soon as the result of the election could be ascertained from the official returns, and that the newly elected officers should at once take the oath of office, and enter upon the performance of their duties; nothing is contained in the Constitution indicating any intention that commissions should be withheld where elections are contested.

If any doubt would be entertained on this point, it would be removed by the provisions of the *Act of* 1865, *ch.* 143, (Supplement to the Code, Art. 35, sec. 30,) which after prescribing the manner in which the returns of the election shall be made, expressly directs that "*from the returns so made, the Governor shall issue commissions to the different persons elected, including Lieutenant Governor.*" * * * * * * *

That Act was passed under the Constitution of 1864, which contained the same provisions as are found in the

present Constitution, and it is still in force, except so far as it refers to the office of Lieutenant Governor, which has been abolished. The provisions of the Constitution and the Act of 1865 are mandatory, requiring the Governor to issue the commission on the basis of the returns. So soon, therefore, as the Governor decided that according to the returns, Mr. Gwinn was elected, and that he had the constitutional qualifications for the office, it became his duty to issue the commission, and to administer to him the oath of office. His *prima facie* title to the office was established, and his right to be installed; this right was not defeated by a mere allegation that he had not been legally elected, or by a notice of contest; as was decided in the case of *Brooke vs. Widdicombe*—he was entitled to hold the office pending the contest, and until his title as shown by the returns, should be defeated by legal proof.

Issuing the commission, and administering the oath of office, are merely ministerial duties imposed upon the Governor, and the writ of *mandamus* lies to direct their performance. This was decided in *Magruder vs. Swann, 25 Md.*, 17, and in *Brooke vs. Widdicombe, 39 Md.*, 401.

2nd. Has the Governor jurisdiction and power under the Constitution, and existing laws to hear and decide the contest? This involves two questions, first, has he the jurisdiction? and secondly, has he been clothed by law with the means of exercising it?

On the first of these questions, the Court is not unanimous, a minority of the Judges entertain the opinion, that the Constitution does not empower the Governor to decide in a case of a *contested election* for the office of Attorney General, and that the case is one falling under the 47th section of the 3rd Article, which declares that " the General Assembly shall make provision for all cases of contested elections of officers not herein provided for."

But, in the opinion of a majority of the Court, the jurisdiction in such case is conferred upon the Governor, by

the *second section of the fifth Article*, which provides that "*the Governor shall decide upon the election and qualification of the person returned.*" This language we think confers the jurisdiction upon the Governor to decide both as to the election and qualification of the person returned as elected, as well in the case of a contest, as where there is no contest, although the case of a contested election is not mentioned in express terms, we see no good reason why it is not within the meaning of the Constitution, the words are sufficient to embrace it. It is identical with the language of the 8*th sec. of Art.* 5, which gives authority to the Courts having criminal jurisdiction, to whom the returns are made, in the case of State's Attorneys, to decide upon the election and qualification of the persons returned.

We construe both these sections, as conferring the jurisdiction in cases of contested election; and are of opinion that the Legislature would have no power under the 47th sec. of Art. 3, to confer the jurisdiction upon any other tribunal, than those designated by the Constitution. This view is confirmed by the contemporaneous and uniform construction which has been given to these provisions. They are the same as those contained in the Constitution of 1864, and while the Legislature acting under the 47th sec. of the 3rd Art., has provided by law for the cases of contested election of Comptroller and Commissioner of the Land Office, conferring upon the House of Delegates the power to decide them; there has been no legislation whatever appointing any tribunal to decide a contested election of Attorney General or State's Attorneys, showing that the Constitution has been understood as having vested the jurisdiction in these cases.

Although the Governor is vested by the Constitution, with jurisdiction of a contested election for Attorney General, the power thus conferred is not self-executing, that is to say, it cannot be executed by the Governor, until he is clothed by law with the authority, means and

instrumentalities, which will enable him to execute the power. The Governor, in his answer, asks directions from the Court, as to the mode of proceeding, and "whether he may hear evidence orally before himself, or by examination before special commissioners, by him to be thereto appointed, or before Justices of the Peace, after notice to the parties; what character of extraneous evidence he can properly act upon, and the extent of his powers as Governor, in compelling the production of such testimony."

From this, it appears that the Governor himself, being the judge to decide the contest, was completely at a loss to know the extent of his power in the premises, and the means he might rightfully employ to execute it. This is not strange, for it is obvious that the jurisdiction conferred upon him, is one which requires the exercise of powers not appertaining to the executive office, and which can only be conferred upon him by law, this Court cannot confer them, nor prescribe the rules for him to observe in hearing and deciding the contest. For this purpose, the action of the Legislative department must be called into exercise, for the Legislature alone has the power of passing laws. The Governor cannot hear and decide the contest in this case, without having authority to have witnesses summoned, to compel their attendance, to administer an oath to them, and to punish them for refusing to attend; to cause the ballots cast at the election to be produced, as well as to have the poll-books brought before him for examination. Without authority conferred upon him by some provision of the Constitution, or Act of Assembly he can do none of these things; neither has he any authority to have depositions taken before a Justice of the Peace or commissioner appointed by him for that purpose; for he has no legal power to administer an oath himself in such case, or to empower another person to do it. It has been argued that these powers are conferred upon the Governor by implication, upon the ground that "where a

general power is conferred, every particular power necessary for its exercise will be implied." We are not willing to adopt this rule, in the broad and unlimited terms in which it has been stated; nor is it in any sense applicable to the present case. The effect of such a construction would be to leave the rights of the appellee, and of the contestant, to be determined by the arbitrary discretion of the Governor. No Court of Justice is warranted in assuming that the Constitution intended that the rights of parties can be taken away or decided by a form of trial, for which the law of the land has made no provision.

But it is clear from the terms of the Constitution that no such powers were intended to be vested in the Governor by implication. *By section* 56, *Article* 3, it is provided that "the General Assembly shall have power to pass all such laws as may be necessary and proper *for carrying into execution the powers vested by this Constitution in any Department or office of the Government, and the duties imposed on them thereby.*"

It is clear from this provision, that the framers of the Constitution intended, that the means to enable the Governor to execute the general power conferred on him by *Art.* 5, *sec.* 2, should be furnished and prescribed by law; without such legislation the general power can have no operative effect. Many examples might be given to show the necessity for such legislation, a single one will suffice. *By Art.* 2, *sec.* 15, the power as conferred upon the Governor to "remove for incompetency, or misconduct, all civil officers who received appointment from the Executive for a term of years."

In order to render this power effective, laws have been enacted by the Legislature, (Code, Art. 42, secs. 13, 14, 15,) prescribing the mode of proceeding in such case, and conferring upon the Governor the power, "to summon witnesses to testify for or against the complaint, and to enforce the attendance of such witnesses in the same manner as the Courts may," &c.

Without this legislation these powers did not belong to the Governor and could not be exercised by him. It has been argued that the general power of removal for cause, conferred on the Governor by the Constitution, might be exercised by him without the aid of these statutes; but the power thus exercised would be arbitrary, and contrary to the spirit and intent of the Constitution, no officer ought to be convicted of incompetency or miscon-duct, and deprived of his office without a fair and impartial trial. The power of the Governor now under consideration is in its nature judicial, "he is to decide on the election and qualification of the person returned." We have said that in the opinion of a majority of the Court, these words confer upon him the jurisdiction to decide a contested election; it is obvious for the reasons before stated, that the power cannot be exercised by him in an arbitrary manner, but the parties interested are entitled to a hearing, and examination of the evidence upon which the contest depends. And in order that the Governor may exercise the power, it is necessary that the law shall clothe him with the authority, and give him the means and instrumentalities essential for "carrying into execution the power vested in him by the Constitution."

This general power lodged in the Governor, though *quasi* judicial in its nature, does not constitute him a Court, nor does it vest him with the powers and capacities of a Court, which being clothed with judicial powers, possesses by its organization and constitution, and without the aid of legislation for that purpose, the powers, means, and appliances required to enable it to hear and decide all causes coming within its jurisdiction. These do not belong to the Governor unless they are conferred on him by law. The appropriate legislation for this purpose, under *Art.* 3, *sec.* 56, has not yet been passed, and therefore we have decided that the Governor does not possess the power to examine and decide the questions raised by the contest made by Mr. Wallis.

It was contended by the counsel of the appellant that even if the Constitution do not empower the Governor to summon or swear witnesses, or enforce their attendance, he may do the best he can, and receive the unsworn statements of such persons as may voluntarily attend before him. The answer to this is, that such a proceeding would be without warrant of law.

The person who has been duly and regularly returned as elected, and is qualified under the Constitution, has a *prima facie* title to the office, which cannot be defeated except upon legal evidence.

The filing of this opinion has been delayed until an opportunity could be had of conferring with Judges BRENT, BOWIE and ALVEY who were not present at the argument. They have examined the record and briefs, and authorize us to say that they concur in *this* opinion.

Order affirmed.

(Decided 21st December, 1875. Opinion filed 1st March, 1876.)

STEWART, J., filed the following concurring opinion :

The question determined, in this case, involves the construction of the Constitution, and whilst entirely concurring in the conclusion of the Court, I have deemed it proper to state briefly, the grounds of my judgment.

Under the circumstances of the case, the duty of the Governor must be found *clearly* prescribed in some provision of the organic or statutory law of the State. It is unreasonable to suppose that it was ever intended to be left for judicial research alone to determine what the Governor should do in such case.

If there is *any obscurity in the 2nd sect. of the 5th Art.,* *there is none in the 11th sec. of the 4th Art.,* and *any doubt* or difficulty about *the former* affords no reason why the *plain provisions of the latter* should be disregarded ; on the contrary, furnishes stronger ground for following their directions.

Considering the two provisions together, there is no discrepancy between them; and referring to the entire Constitution and its general purposes, as to the election and installation of the various officers provided for; and its contemplated legislative action in regard thereto, by sections 56, 47, 42 and 49 of the 3rd Art., in aid of any existing legislation, recognized by the 5th Art. of the Bill of Rights; it would seem there ought to be no difficulty about the meaning of the 2nd section of the 5th Article.

Constitutions were certainly never meant to be dependant upon judicial construction for their meaning. They were designed for practical purposes, and to be of easy comprehension to persons of plain, common sense, and ordinary understanding.

The people make and adopt them, and are presumed capable of understanding them. Established upon mature deliberation, as fundamental provisions of government, there ought to be no obscurity about their meaning, and no conflict or inconsistency in any of their provisions.

It has been universally considered that the leading rule to govern, in the interpretation of Constitutions, as of all other instruments, is to ascertain therefrom, the intention of the parties thereto, to be derived from an examination of the entire instrument.

It must have been intended, that all the parts should be consistent with each other; and therefore the repugnancy of one provision with another is to be avoided.

If the words of one clause are uncertain, their meaning can be learned, by comparing them with other words and sentences in the instrument; *the effect and consequence of a particular construction, is to be regarded; because, if a literal meaning would involve a manifest absurdity, it ought not to be adopted.* If necessary to refer to authorities for such self-evident propositions, see *Campbell vs. Morris,* 3 *H. & McH.,* 535; *Jarrett vs. Hammond,* 17 *Md.,* 304; *State vs. Wayman,* 2 *G. & J.,* 285; *Mayor and C. C. vs.*

*State,* 15 *Md.,* 458; *Bradford vs. Jones,* 1 *Md.,* 369; *Bandel vs. Isaac,* 13 *Md.,* 225 ; *Story's Com. on Const.,* 400, 451, 453

Having in view the force and effect of the 11th sec. of 4th Art., and 56th, 47th, 42nd and 49th secs. of the Constitution, there should be no difficulty about the meaning of the 2nd sec. of the 5th Art. now in question.   The 11th sec. of 4th Art. *in terms applies to all officers except State's Attorneys;* and of course, includes the Attorney General. It is also *mandatory,* using in its last' clause, *the most imperative language,* to wit: "*and in all such elections, the person having the greatest number of votes shall be declared to be elected;*" *which makes it obligatory upon the Governor, to issue the commission to that person, for the office of Attorney General, who has from the returns before him, the highest number of votes.*

Under it the Governor *is required* to issue commissions to all the persons elected, *without further reference to their qualifications;* whilst it is made his duty under the 2nd sec. of 5th Art. in regard to the Attorney General, to *decide on his election and qualification.*

The exercise of these different powers require correspondent action on the part of the Governor—*the first ministerial, the second judicial.*

The one commands *immediate action,* the other, *allows time for investigation and judgment.*

The two provisions must be construed so as to avoid conflict between them, according to the established rule we have referred to.

If the commission *had promptly issued* to Mr. Gwinn, in pursuance of *the 11th sec. of 4th Art.,* that would not have prevented the Governor from afterwards deliberately *deciding upon the legality of his election,* under *the 2nd sec. of 5th Art., provided there had been such legislation as contemplated by the Constitution,* 56*th and* 47*th sections of* 3*rd Article.*

But if such meaning be given to the 2nd sec. of 5th Art. as virtually to destroy or mislead, the exercise of the power, under the 11th sec. of 4th Art.; it is obvious, *that would antagonize, or annihilate the force of this last provision*—of course such construction cannot be right.

Besides, it is not to be presumed, in regard to a provision requiring the Governor, *to furnish the persons elected, with the official certificate of their title to office*, the Constitution ever designed to give to the Governor the power *to suspend and render void its operation.*

In the absence of *the clearest terms* to that effect, the Governor in undertaking *to avoid its mandates*, would in fact be exercising the high and *unauthorized prerogative* of dispensing with a positive constitutional mandate.

If all officers, whose election was contested, are to have their commissions refused or suspended, until the determination of the contest, it would necessarily result in the utter disregard of sundry other provisions, interrupt the regular installation of the officers, and lead to disorder and revolution.

By the 9th sec. of Art. 15, the term of all officers, except where special provision is otherwise made, is to commence from the time of their election, and they are required to qualify, as soon thereafter as practicable.

By the 7th sec. of Art. 2, the refusal or neglect of any officer, elected or appointed, to take the oath of office provided by the 6th sec. (modified by the 3rd sec. of 15th Art.,) shall be considered a refusal to accept the office.

Further provision by the 10th sec. of Art. 68 of the Code, is made to insure the prompt acceptance of office. The officers are not entitled to any salary, until they qualify and enter upon the discharge of duty. *Spence vs. Jump*, 28 *Md.*, 1.

If a contest suspends the right to be commissioned and installed, that would deprive the party elected of his office, and abridge the term thereof.

On the other hand, if the Governor under the 11th sec. of the 4th Art., declares the result so soon as the returns of the election are made to him, and issues commissions accordingly, *no contestant is deprived of the opportunity afterwards, of showing the illegality of the election if the necessary laws are passed, contemplated by the Constitution.*

Provision being made by law in such case, upon a hearing *the incumbent who holds under the returns must be ousted, and the contestant installed, or a new election had.*

The right of all parties are preserved, and the entire proceedings growing out of the election are thus conducted in order.

As the law and Constitution now stand, there was in truth *no legal contest before the Governor.* Mr. Wallis' letter to him was a mere notice or caveat, which he had no official authority to consider as instituting a contest between him and Mr. Gwinn.

Under the express terms of the 2nd sec. of 5th Art., as they stand in the Constitution, the Governor is only authorized to decide upon the election and the qualification *of the person returned; and in case of a tie, to designate which shall qualify;* that is, *if the returns do not show that any person has the greatest number of votes; but there is a tie between two or more,* he shall *designate which person shall qualify,* and administer the oath of office to the *person elected,* that is, to *the person returned* or to the one *he may designate in case of a tie;* this has reference to *action upon the returns,* and not to the result of a contest and determination thereon.

If the means had been given to the Governor by appropriate legislation in pursuance of the 51st sec. of 3rd Art., to enable him to decide upon the *election and qualification of the person returned,* and *no further provision had been made,* and the Governor should find accordingly to the allegation of Mr. Wallis, that such *"fraud, violence* and *intimidation"* prevailed at the election in Baltimore, as to

exclude *the entire vote* of that city, (assuming in the absence of legislation to that effect, that such would be sufficient cause,) and that Mr. Wallis had the majority of the remaining votes; *that could only properly result in a decision by the Governor, that Mr. Gwinn the person returned was not elected.*

*Under that provision, aided by the legislation referred to and no other, the Governor would have no authority to declare Mr. Wallis elected.* The only legitimate result under such a state of things, would be a *failure of the election of any person.*

But if further provision had also been made under the 47th sec. 3rd Art. to authorize the Governor to dispose of the matter as "*a case of contested election,*" he would be provided with authority to determine *between the contestants; without some law to that effect, the Governor clearly would have no right to throw out the legal vote of the City,* because *fraudulent votes had been received;* and no authority to decide in favor of Mr. Wallis, so as to vest in him the right to the office.

It is the exercise of one specific power to decide against the *person returned,* and quite another and different power, because that person *is not elected,* to proceed to *install somebody else in the office.*

The one, upon no principle of law or logic, is the necessary sequence of the other.

The authority must be provided for such result, or it cannot be rightfully exercised.

Under the 12th sec. of 4th Art. provision is made, in reference to *a failure to elect* any of the officers therein named, and if the person *returned as elected, fails to make good his title, a new election must be ordered.*

Legislation may be provided for the cases of other officials, *whose election is contested,* under the 56th and 47th secs. 3rd Art.—upon both of which, *legislation is necessary* to meet *the exigencies of the case now in question.*—with-

out which, the Governor has not the means of deciding *dehors* the returns, whether the person has been elected legally ; and no power to instal Mr. Wallis, if Mr. Gwinn had failed.

Elections in popular systems of government, are the immediate and original, acts of the people in their primary and sovereign capacity.

All government of right originates from the people. *1st Art. Bill of Rights.*

The authentic and *prima facie* evidence of the result of an election, and provisions for any contest thereof, ought to be free from all ambiguity.

All legal intendments are to be made in favor of the legality and validity of such elections. They may, by the Constitution, or law in pursuance thereof, be made to import by *the prescribed mode of authentication, absolute and conclusive verity,* as to the result; or only as affording *prima facie* evidence thereof, and *to be subject to contest.*

When an election has been held and duly certified, as may be prescribed, *unless there is* some *constitutional* or *statutory provision providing otherwise;* it is the *solemn and binding act of the people,* affording *conclusive evidence of their decision. Unless provision is made for a contest over it,* the result cannot be impeached, *and must stand as their act. This is the necessary result.*

The Constitution itself, under the 15th Art. thereof, was adopted and has gone into effect by virtue of an election by the people, and the proclamation thereof by the Governor at the time, upon the returns made to him, thus providing that it should afford not *prima facie,* but *conclusive evidence* of their action, in the establishment of the present organic law of the State, under which all the powers of the government in the various departments thereof are now exercised, and the rights and liberties of the people secured.

After the people have voted, and the appropriate officers made due returns thereof, *the prompt installation of the offi-*

*cers elected*, is contemplated by the Constitution as *the necessary result*, and it devolves upon any party disputing their validity, to show, authority for his right to do so.

The *onus* is upon him to establish his right.

Elections were intended to be *legal* and *bona fide* proceedings, expressive of the voice and purpose of the people through the ballot-box, and as there might be fraud or illegality, the Constitution contemplated that any person affected thereby, should have the right to contest their validity by suitable legislation for that purpose.

When the result of the election is duly certified to the Governor, the 11th sec. of 4th Art. provides for proclamation of the fact, and he is required to issue the commission to those having the greatest number of votes, who are in truth by *the words of that section declared to be elected*.

Notice of contest cannot relieve the Governor from the performance of this inevitable duty, or suspend the *fiat* of the Constitution.

This has been settled by the decisions of this Court. See amongst others, *Magruder vs. Swann*, 25 *Md.*, 209; *Brooke vs. Widdicombe*, 39 *Md.*, 386.

Where the Constitution provides, *that an election may be contested, and that the Legislature shall pass the necessary laws for that purpose; and no legislative provision has been made upon the subject*, there ought to be no trouble, it seems to me, in determining *that there is no competent authority under which to conduct and decide a contest over it*.

The constitutional requirement in such case *cannot execute itself*, but remains as *a mandate* without practical significance, until *appropriate legislation* gives to it due force and effect.

The 2nd sec. of the 5th Art. *per se*, confers upon the Governor no authority to cause witnesses to appear before him, or to compel their attendance by attachment or other process, or to authorize depositions to be taken under commission or otherwise, and can afford none *of the indispen-*

*sable means* of investigating, hearing and determining the controversy, as a case of *contested election.*

The Governor, in undertaking to decide a contest under such circumstances, would be holding quite a novel Court without the usual adjuncts, and with very limited opportunity of doing justice between the parties, it would seem.

No doubt it was competent for the framers of the Constitution, to have provided all the details for the trial of a *contested election* by the Governor, as to the office of the Attorney General, if they had thought proper to have done so, but not having so provided, the Governor has not a particle of authority, by *express terms or reasonable implication, to amend and supplement* the Constitution, by adding in effect, the necessary provisions for that purpose.

The exercise of power in such case, would be mere assumption and usurpation.

Constitutions *deal in generalities,* and were *never intended to supply a Code of laws, to meet all cases of litigated questions;* and no doubt, whether wisely or not, is now immaterial, the Constitution intended, merely to provide, that the Governor, *as to a contest over the election of Attorney General, should decide upon his election and qualification, by the 2nd sec. of 5th Art.*

Whilst the Legislature must provide the necessary means according to its discretion, to enable him to execute that power, it would not be competent for that body, to constitute any other person or tribunal to be the judge in such case.

It is much better to abide by *safe landmarks in the exercise of power,* than to venture upon mere *experimental enterprizes.*

Latitudinal and doubtful construction of the powers of the Executive, under the Constitution of a free people, ought never to be sanctioned by the Courts.